Julie Teel (CA Bar No. 208282)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 7745
San Diego, CA 92167
Phone: (619) 224-3400
Facsimile: (619) 224-3700
Email: jteel@biologicaldiversity.org

Brendan Cummings (CA Bar No. 193952)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252
Phone:   (760) 366-2232
Facsimile: (760) 366-2669
Email: bcummings@biologicaldiversity.org

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation; GREENPEACE, Inc., a non-profit corporation; and FRIENDS OF THE EARTH, a non-profit corporation,<br><br>                  Plaintiffs,<br>      v.<br><br>DR. WILLIAM BRENNAN, in his official capacity as Acting Director of the U.S. Climate Change Science Program; U.S. CLIMATE CHANGE SCIENCE PROGRAM; JOHN MARBURGER III, in his official capacity as Director of the Office of Science and Technology Policy and Chairman of the Federal Coordinating Council on Science, Engineering, and Technology; OFFICE OF SCIENCE AND TECHNOLOGY POLICY; and FEDERAL COORDINATING COUNCIL ON SCIENCE, ENGINEERING, AND TECHNOLOGY,<br><br>                  Defendants. | Case No. 06-CV-7062 (SBA)<br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br><br>Date:  March 20, 2007<br>Time:  1:00 p.m.<br>Courtroom:  3 (3rd Floor) |

# TABLE OF CONTENTS

**Page**

I.     Introduction ................................................................................................................... 1

II.    Legal and Factual Background ....................................................................................... 2

    A.     Congressional Findings and Purpose of the GCRA ............................................ 2

    B.     Reporting Requirements and Public Participation .............................................. 4

    C.     The 2000 Assessment and 2003 Research Plan .................................................. 6

    D.     Requests for Defendants to Comply with the GCRA ......................................... 8

III.   Argument ....................................................................................................................... 9

    A.     Standard for Summary Judgment ....................................................................... 9

    B.     Defendants' Violations of the Research Plan and Assessment Provisions of the GCRA are Reviewable Under the Administrative Procedure Act .................................................. 9

        1.     Defendants Have Clearly Violated the Statutory Deadlines for Producing the Updated Research Plan and Assessment .......................................................... 9

        2.     Defendants' Violations of the GCRA's Statutory Deadlines are Reviewable under the Administrative Procedure Act ................................................... 10

    C.     Plaintiffs Have Standing to Bring Their Claim ................................................ 13

        1.     General Rule of Law ................................................................................. 13

        2.     Plaintiffs Have Standing Based on Procedural Injuries ................................. 14

        3.     Plaintiffs Have Standing Based On Informational Injuries ........................... 21

IV.    Conclusion ................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......................................................................................... 9

*Animal Legal Defense Fund v. Veneman*,
469 F.3d 826 (9th Cir. 2006) ..................................................................... 10, 20

*Barlow v. Collins*,
397 U.S. 159 (1970) ........................................................................................ 10

*Biodiversity Legal Found. v. Badgley*,
309 F.3d 1166 (9th Cir. 2002) ........................................................................ 13

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................................................... 9

*Center for Biological Diversity v. Abraham*,
218 F. 2d 1143 (N.D. Cal. 2002) ........................................... 10, 11, 12, 16, 21

*Center for Biological Diversity v. Norton*,
254 F.3d 833 (9th Cir. 2001). ......................................................................... 10

*Citizens for Better Forestry v. U.S. Department of Agriculture*,
341 F.3d 961 (9th Cir. 2003) ....................... 11, 12, 13, 14, 15, 16, 18, 20, 21

*Defenders of Wildlife v. EPA*,
420 F.3d 946 (9th Cir. 2005) .......................................................................... 20

*Defenders of Wildlife v. Johann*,
2005 U.S. Dist. LEXIS 42273 (N.D. Cal. 2005) ...................................... 16, 20

*Federal Election Commission v. Akins*,
524 U.S. 11 (1998) .................................................................................... 21, 22

*Friends of the Earth v. Laidlaw*,
528 U.S. 167 (2000) ........................................................................................ 13

*Friends of the Earth v. Watson*,
2005 U.S. Dist. LEXIS 42335 (N.D. Cal. 2005) ............................................ 20

*Hill v. Allstate Ins. Co.*,
962 F. Supp. 1244 (C.D. Cal. 1997) ................................................................. 9

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992) ........................................................................................ 13

*Nat'l. Res. Defense Council, Inc. v. Sec. & Exch. Comm'n*,
606 F.2d 1031 (D.C. Cir. 1979) ...................................................................... 10

*Norton v. Southern Utah Wilderness Alliance*
542 U.S. 55 (2004) .......................................................................................... 11

*Nuclear Info. & Res. Serv. v. NRC*,
457 F.3d 941 (9th Cir. 2006) .......................................................................... 10

*People v. USDA*
2006 LEXIS 72226 (N.D. Cal. 2006) ............................................................. 12

*Public Citizen v. Department of Transportation*,
316 F.3d 1002 (9th Cir. 2002) ........................................................................ 20

*Salmon River Concerned Citizens v. Robertson*,
    32 F.3d 1346 (9th Cir. 1994) ...................................................................................16, 18

*U.S. v. Monsanto*,
    491 U.S. 600 (1989) ...............................................................................................10

**Statutes**

15 U.S.C. § 2921 ...........................................................................................................1, 2

15 U.S.C. § 2931 ....................................................................................2, 3, 12, 17, 20

15 U.S.C. § 2932 ...............................................................................................................3

15 U.S.C. § 2934 ...................................................1, 3, 4, 5, 7, ,9 11, 14, 17, 20, 21, 22

15 U.S.C. § 2936 .................................................................................2, 5, 7, 9, 11,14

15 U.S.C.§ 2938 ...........................................................................................6, 15, 20

28 U.S.C. § 1361 ............................................................................................................13

5 U.S.C. § 551 ................................................................................................................10

5 U.S.C. § 701 ........................................................................................................10, 13

5 U.S.C. § 702 ........................................................................................................10, 13

5 U.S.C. § 706 ................................................................................................................13

**Other Authorities**

136 Cong. Rec. E3593-02 (October 27, 1990) ...............................................4, 5, 11, 15

136 Cong. Rec. H12996-01(October 26, 1990) ...............................................................4

65 Fed. Reg. 75319 (December 1, 2000) .....................................................................6, 7

68 Fed. Reg. 748 (January 7, 2003) ................................................................................7

69 Fed. Reg. 72181 (December 13, 2004) ......................................................................6

Senate Report No. 101-40 (1990) ....................................................................................3

**Rules**

Fed. R. Civ. Proc. 56 (c) .................................................................................................9

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

It is the consensus view among leading scientists that anthropogenic sources of greenhouse gases, primarily from burning fossil fuels for energy, are responsible for the unprecedented rate of warming observed over the past century.  Scientists warn that global warming is leading to profound changes in the earth's climate that endanger human health and welfare and the environment.  Projected impacts include melting of the permafrost in Alaska, increased stress on water supplies in the Western states, losses in local biodiversity, coral reef die off, rising sea levels and storm surges.[1]  The United States alone is responsible for 25 percent of global carbon dioxide ($CO_2$) emissions.[2]  California, if compared against other countries in the world, is the twelfth largest emitter of $CO_2$.[3]

While climate change[4] is a complex area of science and what to do about it is the subject of intense political debate, this suit concerns straightforward violations of two statutory deadlines set forth in the Global Change Research Act.  In 1990, amidst growing concerns that human activities were having a significant impact on the earth's climate, Congress enacted the Global Change Research Act to address the need for a coordinated and comprehensive national research program on global climate change.  15 U.S.C. §§ 2921, *et seq.*  The Act requires, *inter alia*, the preparation and distribution of two reports.  First, the Act mandates the preparation of a "National Global Change Research Plan" ("Research Plan") setting forth the goals and priorities of a national research program, which must be updated no less than every three years.  15 U.S.C. § 2934.   The last Research Plan was published in July 2003, which triggered a deadline of **July 2006** to publish a revised Research Plan.  Second, the Act requires the preparation of a scientific assessment ("Assessment") that synthesizes the current state of

---

[1]   U.S. Global Change Research Program, *Climate Change Impacts on the United States: The Potential Consequences of Climate Variability and Change*, A Report of the National Assessment Synthesis Team (2000).   MacCracken Decl., ¶4, Exh. 1 (Overview Report).

[2]   Statistic from the Energy Information Administration website:   www.eia.doe.gov/oiaf/1605/ggccebro/chapter1.html.

[3]   *See, e.g.,* Gov. Schwarzenegger Signs Landmark Legislation to Reduce Greenhouse Gas Emissions (September 27, 2006), available at http://www.climatechange.ca.gov/.

[4]   The terms "global warming" and "climate change" refer to the same phenomena and are used interchangeably in this brief and the accompanying declarations.

knowledge of climate change research, no less than every four years. 15 U.S.C. § 2936.  The first Assessment was published on October 31, 2000 and transmitted to Congress in November 2000.  This triggered a deadline of *November 2004* to submit an updated report.

The Defendants,[5] in complete disregard of the explicit requirements of the Act, have not revised the 2003 Research Plan or published an updated Assessment by the required deadlines. These plain violations of the Act's deadlines are the only subject of this suit.  Plaintiffs, Center for Biological Diversity, Greenpeace, Inc., and Friends of the Earth, are filing the instant motion seeking a court order to compel the Defendants to publish the now overdue Assessment and Research Plan.  Defendants' failure to meet these deadlines prevents federal agencies, policymakers, environmental organizations, and other stakeholders from making informed policy decisions because the previous Assessment is now six years out of date.  In addition, the lack of a revised Research Plan reflects Defendants' failure to adequately respond to the current needs of research, regulatory, policy and legislative communities and advances in scientific research.  Defendants' actions also have effectively precluded Plaintiffs from commenting on the sufficiency of the goals and priorities of the research program.  These injuries and others, described more fully below, have forced Plaintiffs to file the instant action.

## II.    LEGAL AND FACTUAL BACKGROUND

### A.    Congressional Findings and Purpose of the GCRA

In 1990, Congress enacted the Global Change Research Act (hereinafter "GCRA" or "Act"). *See* Global Change Research Act of 1990, Public Law 101-606, 104 Stat. 1096 (1990) (codified at 15 U.S.C. §§ 2921, *et seq.*).  The GCRA's goal "is to provide for development and coordination of a comprehensive and integrated United States research program which will assist the Nation and the world to understand, assess, predict, and respond to human-induced and natural processes of global change." 15 U.S.C. § 2931(b).  By enacting the GCRA, Congress explicitly acknowledged the devastating impacts of global climate change and made the following findings:

---

[5]    Defendants in this action are: Dr. William Brennan (Deputy Assistant Secretary of Commerce for International Affairs and Acting Director of the U.S. Climate Change Science Program (CCSP)); CCSP; John H. Marburger, III (Director of the Office of Science and Technology Policy (OSTP)); OSTP; and the Federal Coordinating Council on Science, Engineering and Technology.

PLAINTIFFS' BRIEF IN SUPPORT                    2                    Case No. 06-CV-7062 (SBA)
OF THEIR MOTION FOR SUMMARY JUDGMENT

(1) Industrial, agricultural, and other human activities, coupled with an expanding world population, are contributing to processes of global change that may significantly alter the Earth habitat within a few human generations.

(2) Such human-induced changes, in conjunction with natural fluctuations, may lead to significant global warming and thus alter world climate patterns and increase global sea levels. Over the next century, these consequences could adversely affect world agricultural and marine production, coastal habitability, biological diversity, human health, and global economic and social well-being.

(3) The release of chlorofluorocarbons and other stratospheric ozone-depleting substances is rapidly reducing the ability of the atmosphere to screen out harmful ultraviolet radiation, which could adversely affect human health and ecological systems.

(4) Development of effective policies to abate, mitigate, and cope with global change will rely on greatly improved scientific understanding of global environmental processes and on our ability to distinguish human-induced from natural global change.

(5) New developments in interdisciplinary Earth sciences, global observing systems, and computing technology make possible significant advances in the scientific understanding and prediction of these global changes and their effects.

(6) Although significant Federal global change research efforts are underway, an effective Federal research program will require efficient interagency coordination, and coordination with the research activities of State, private, and international entities.

15 U.S.C. § 2931(a). The synthesis and dissemination of relevant information regarding global change was of paramount concern to Congress as was the need for public participation. 15 U.S.C. §§ 2931(b), 2932(e)(4) & 2934. These objectives are underscored by the legislative history preceding the enactment of the GCRA which stressed increased interagency coordination and public participation so that both agencies and citizens can make informed policy decisions. For example, Senate Report No. 101-40 (1990), which recommended the passage of the Bill, identified the following objectives:

In addition, the ongoing interagency research effort would be strengthened by establishing a formal statutory global change research planning process. This planning process would create a stable framework for the long-term research that is needed to help answer difficult scientific questions about global change and to provide government officials and citizens with the information that they will need to make informed policy choices.

Similarly, in his speech to the House of Representatives, the Honorable Robert Roe of New Jersey stated:

> [T]he bill provides that the voluminous amount of information produced by the program will be translated at least once every 4 years into publicly available assessment documents which address the effects and long-term trends associated with global change . . . The Committee wants to ensure that global change research and the development of effective policies to respond to global change will occur in parallel as we continuously broaden our knowledge and understanding of global change.
>
> * * *
>
> [T]he bill brings industry and environmental groups into the process by allowing them to review and comments (sic) on the research plan. This provision will avoid the pitfalls of earlier environmental programs in which Federal programs were not open to public review.
>
> * * *
>
> The authors of this legislation believe strongly that academic, industry and environmental, State government, and other groups should have an opportunity to provide advice to those in the Federal Government administering the program. After all, the environmental and financial impacts are likely to be large and far-reaching.

136 Cong. Rec. E3593-02, E3593-3594 (October 27, 1990). *See also*, 136 Cong. Rec. H12996-01, H13001 (October 26, 1990) (Mr. Jones of North Carolina noted that a coordinated Research Plan "will enhance our understanding of the Earth system on a global scale, improve our capability to predict natural or human induced changes and, most importantly, provide the best scientific information on which we can develop necessary and responsible policy decisions").

### B.    Reporting Requirements and Public Participation

The GCRA requires, *inter alia*, the preparation of two substantive reports. First, the Act requires the development of a "National Global Change Research Plan" ("Research Plan") for the actual implementation of the Global Change Research Program. 15 U.S.C. § 2934(a). The Research Plan "shall contain the recommendations for national global change research" and shall establish "the goals and priorities for Federal global change research which most effectively advance scientific understanding of global change and provide usable information on which to base policy decisions related to global change" for a 10-year period starting the date the Research Plan is submitted to Congress. 15 U.S.C. § 2934 (a) & (b)(1). The GCRA requires the submission of a revised Research

Plan "at least once every three years." 15 U.S.C. § 2934(a). To further the Act's goal of encouraging public participation, a summary of the Research Plan is also required to be published in the Federal Register for a public comment period of not less than 60 days. 15 U.S.C. § 2934(f).

Although the Research Plan is required to project Defendants' goals and priorities for a 10-year period, it was Congress' intent that the results of their research be disclosed more frequently. 29 U.S.C. §2936; *see also*, comments from House Representative. Roe, 136 Cong. Rec. E3593-02 at E3593 (October 27, 1990) ("Although the plan describes a 10-year research program, the results of that program should be consolidated and communicated frequently."). Accordingly, the GCRA requires the preparation of a scientific assessment (hereinafter "Assessment") that:

> (1) integrates, evaluates, and interprets the findings of the Global Change Research Program and discusses the scientific uncertainties associated with such findings;
>
> (2) analyzes the effects of global change on the natural environment, agriculture, energy production and use, land and water resources, transportation, human health and welfare, human social systems, and biological diversity; and
>
> (3) analyzes current trends in global change, both human-inducted [human-induced] and natural, and projects major trends for the subsequent 25 to 100 years.

15 U.S.C. § 2936. This report must be prepared "not less frequently than every 4 years." *Id.*

Like the Research Plan, the Assessment is also subject to public review. For example, in the 2003 Research Plan Defendants emphasized the need to "communicate results to domestic and international scientific and stakeholder communities" and stressed "openness and transparency in its findings and reports," which include the Assessment. Teel Decl., Exh. 1 at pg. 27 (2003 Research Plan).[6] A "stakeholder" is defined as:

> individuals or groups whose interests (financial, cultural, value-based, or other) are affected by climate variability, climate change, or options for adapting to or mitigating these phenomena. Stakeholders participate during the "scoping" process by providing information that helps define the audience and potential uses of a product. In addition, stakeholders provide comments on the prospectus, and on the product during the public comment period.

---

[6]     Plaintiffs attach a summary version of the 2003 Research Plan as the entire report is 341 pages. The full Research Plan is available at http://www.climatescience.gov/Library/stratplan2003/.

Teel Decl., Exh. 1 at pg. 9 (2003 Research Plan) & Exh. 2 at pg. 3 (pamphlet on synthesis and assessment products).

This public participation element is also emphasized in Defendant Climate Change Science Program's (CCSP's) "Guidelines for Producing CCSP Synthesis and Assessment Products." The Federal Register notice, which announced the availability of the guidelines on the CCSP's website, contained the following description:

> To ensure consistency and transparency in the processes that will be used by the lead and supporting CCSP agencies in preparing the products, the guidelines describe the roles of different parties and the steps to be followed in each of three phases of the preparation process--developing the prospectus, drafting and revising the document, and final approval and publication of each product. This process of product development will *facilitate involvement of the research community and the public* in ensuring that the products meet the highest standards of scientific excellence. *The guidelines also encourage transparency by ensuring that public information about the status of the products will be provided on the CCSP web site.*

69 Fed. Reg. 72181 (December 13, 2004) (emphasis added). Specifically, the guidelines require lead agencies for each product to post the second draft of the product for public comment for not less than 45 days and post the final product on the CCSP website. Teel Decl., Exh. 3 at pgs 8-10 (CCSP Guidelines) & Exh. 2 at pg. 2 (pamphlet on synthesis and assessment products).

Importantly, the GCRA also requires that research findings, including the Assessment, be made available to the Environmental Protection Agency and "all Federal agencies and departments for use in the formulation of coordinated national policies for responding to human-induced and natural processes of global change pursuant to other statutory responsibilities and obligations." 15 U.S.C. § 2938(b)(1) & (2).

## C.   The 2000 Assessment and 2003 Research Plan

The first Assessment was completed on October 31, 2000 and transmitted to Congress in November 2000. *See* 65 Fed. Reg. 75319 (December 1, 2000); MacCracken Decl., ¶¶4 n.2, 12.[7]   This

---

[7]   Given the length of the entire Assessment, the 2000 Assessment's Overview Report is attached as Exhibit 1 to the MacCracken Declaration. In addition, portions of the Foundation Report are attached to the Duchin, Siegel, Dustan, Coequyt, and Lee Declarations. The entire 2000 Assessment is available at http://www.usgcrp.gov/usgcrp/Library/nationalassessment/foundation.htm.

report, entitled "Climate Change Impacts on the United States: the Potential Consequences of Climate Variability and Change" (hereinafter "2000 Assessment"), identifies the key climatic vulnerabilities of regions, resources and sectors of the U.S.   Among the findings of the 2000 Assessment is that "assuming continued growth in world greenhouse gas emissions, temperatures in the U.S. will rise 5-9ºF (3-5ºC) on average in the next 100 years."   *Id.* at page 10.   The 2000 Assessment also projected numerous adverse environmental impacts to the United States, including the melting of the permafrost in Alaska, retreat and thinning of sea ice, increased stress on water supplies in the Western states, losses in local biodiversity, increased forest fires, coral reef die off and rising sea levels.   *Id.* at pages 10-11, 64-69, 78-79 110-111, 114-117.

Prior to the final publication of the 2000 Assessment, a draft of the report was made available for public comment and review and notice was published in the Federal Register on June 12, 2000.   65 Fed. Reg. 36845 (June 12, 2000).   The 2000 Assessment was transmitted to Congress in November 2000 and made available to the public on the internet shortly thereafter.   *See* 65 Fed. Reg. 75319 (December 1, 2000) (notice of the report's availability).   The completion of the Assessment in 2000 triggered a deadline of 2004 for an updated Assessment. 15 U.S.C. § 2936.   Defendants did not meet this deadline.   Teel Decl., ¶¶4-5; Siegel Decl., ¶¶24-25.

In February 2002, President George W. Bush announced the formation of a new management structure, the Climate Change Science Program ("CCSP"), to coordinate and provide direction for U.S. research efforts in the areas of climate and global change, including those required under the GCRA. *See* 68 Fed. Reg. 748 (January 7, 2003).

In January 2003, a draft of Defendant CCSP's Research Plan was made available for public comment and notice of its availability was published in the Federal Register.   68 Fed. Reg. 748 (January 7, 2003). In July 2003, Defendant CCSP transmitted its final Research Plan to Congress and a copy of the Research Plan was posted on the CCSP's website. Teel Decl., ¶2, Exh.1 (2003 Research Plan). The publication of the final Research Plan in July 2003 triggered a deadline of ***July 2006*** for the submission of a revised Plan.   15 U.S.C. §2934(a).   To date, Defendants have not prepared a revised Research Plan. Siegel Decl., ¶14-16.

**D.      Requests for Defendants to Comply with the GCRA**

On April 14, 2005, in response to a request made by Senators Kerry and McCain, the United States Government Accountability Office ("GAO") analyzed whether the CCSP's Research Plan met the requirements of the GCRA.  Teel Decl., ¶6, Exh. 5 (GAO Report).  As an initial matter, the GAO noted that the CCSP did not meet the reporting deadline for the Assessment as required by the Act. *Id*. at page 2.   Furthermore, the GAO criticized the CCSP's stated intent in its Research Plan to publish 21 individual reports in lieu of an updated Assessment:

> Because the 21 individual reports are planned to address scientific uncertainties associated with climate change and other technical subjects and are to be issued over a period of 3 or more years, it may be difficult for the Congress and others to use this information effectively as the basis for making decisions on climate policy.  We believe it would be helpful to the Congress and other users if CCSP summarized the 21 reports in a single volume for a general audience as was done in 2000.

*Id*. at pages 4-5.[8]

On November 3, 2005, Kassia Siegel, on behalf of the Center for Biological Diversity and Greenpeace, submitted a letter to Defendants requesting compliance with the requirements of the GCRA and issuance of the overdue Assessment.  Siegel Decl., ¶24 & Exh. 12 (November 3, 2005 letter).  On February 10, 2006, James Mahoney, the former Director of Defendant CCSP, responded to Ms. Siegel's correspondence.  Siegel Decl., ¶26, Exh. 13 (February 10, 2006 letter).   The letter did not indicate that the CCSP would take any action to accelerate the production of the overdue Assessment.  *Id*.

On September 6, 2006, Ms. Siegel again wrote to the CCSP reiterating Plaintiffs' request for Defendants to comply with the requirements of the Act. Siegel Decl., ¶27, Exh. 14 (September 6, 2006 letter).   After receiving no response, Plaintiffs filed the instant action on November 14, 2006. *Id*. Plaintiffs seek a court order compelling the Defendants to produce both the Assessment and Research Plan.  *See* Complaint at page 18 (prayer for relief), Docket No. 1.

---

[8] The 2003 Plan originally called for the preparation of 21 separate reports to be published over the course of 2-4 years.  The CCSP's website contains an updated timeline that projects the production of the 21 reports between May 2006 and May 2008. Teel Decl., ¶5, Exh. 4.

### III.    ARGUMENT

#### A.    Standard for Summary Judgment

Summary judgment is appropriately granted when the evidentiary record shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. Proc. 56(c).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "When the moving party meets its burden, the adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial.  Summary judgment will be entered against the non-moving party, when appropriate, if that party does not present these specific facts."  *Hill v. Allstate Ins. Co*., 962 F. Supp. 1244, 1246 (C.D. Cal. 1997) (*citing Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 256 (1986) and *Celotex*, 477 U.S. at 325).

#### B.    Defendants' Violations of the Research Plan and Assessment Provisions of the GCRA are Reviewable Under the Administrative Procedure Act

##### 1.    Defendants Have Clearly Violated the Statutory Deadlines for Producing the Updated Research Plan and Assessment

As discussed above, there can be no question that Defendants have violated the GCRA's explicit deadlines for updating both the Research Plan and Assessment. The GCRA explicitly requires that a revised Research Plan "***shall*** be submitted at least once every three years," 15 U.S.C. § 2934(a) (emphasis added), yet the last Research Plan was issued in July 2003, over three years ago.  Similarly, the GCRA directs that Defendants "***shall*** prepare" an Assessment "not less frequently than every 4 years," 15 U.S.C. § 2936, and yet the last Assessment was transmitted to Congress in November 2000, more than six years ago.  *See* Legal and Factual Background. Section I.A-C. *supra*.

1    When a statute uses the term "shall" as is the case for the GCRA provisions at issue here,

2    Congress has imposed a mandatory, non-discretionary duty. *See, e.g., U.S. v. Monsanto*, 491 U.S. 600,

3    607 (1989) (in discussing statue using the word "shall," the Court noted that "Congress could not have

4    chosen stronger words to express its intent"); *Center for Biological Diversity v. Norton,* 254 F.3d 833,

5    837-838 (9th Cir. 2001) (*internal citations omitted*) (court must give effect to the unambiguously

6    expressed intent of Congress).   The GCRA does not grant Defendants the authority or discretion to

7    change statutory deadlines.   Any excuses offered by Defendants must fail.

8    **2.    Defendants' Violations of the GCRA's Statutory Deadlines are Reviewable**

9    **under the Administrative Procedure Act**

10    In the absence of a statutory grant of a private right of action, a Plaintiff challenging an agency

11    action may do so under the Administrative Procedure Act ("APA").   *Nuclear Info. & Res. Serv. v. NRC*,

12    457 F.3d 941, 951 (9th Cir. 2006).   The APA specifically provides that, "[a] person suffering a legal

13    wrong because of agency action, or adversely affected or aggrieved by agency action within the

14    meaning of a relevant statute, is entitled to judicial review thereof."   5 U.S.C. § 702.   "Agency action"

15    as defined by the statute "includes the whole or part of an agency rule, order, license, sanction, relief, or

16    the equivalent or denial thereof, or failure to act."   5 U.S.C. §701(b)(2) (incorporating by reference

17    definition at 5 U.S.C. § 551 (13)). Defendants' failure to comply with the GCRA's deadlines constitutes

18    a "failure to act."   *See also*, *Center for Biological Diversity v. Abraham*, 218 F. 2d 1143, 1157, 1163

19    (N.D. Cal. 2002).

20    The Supreme Court has held that "preclusion of judicial review of administrative action

21    adjudicating private rights is not lightly to be inferred . . . judicial review of such administrative action

22    is the rule, and nonreviewability an exception which must be demonstrated."   *Barlow v. Collins*, 397

23    U.S. 159, 166 (1970) (*internal citations omitted*).   As such, the APA "creates a strong presumption of

24    reviewability that can be rebutted only by a clear showing that judicial review would be inappropriate."

25    *Animal Legal Defense Fund v. Veneman*, 469 F.3d 826, 836 (9th Cir. 2006) (*citing Nat'l. Res. Defense*

26    *Council, Inc. v. Sec. & Exch. Comm'n*, 606 F.2d 1031, 1043 (D.C. Cir. 1979)).

27    A plaintiff "who brings a statutory enforcement under the [APA] must meet its statutory

28    requirements for standing.   The plaintiff must establish (1) that there has been final agency action

adversely affecting the plaintiff, and (2) that, as a result, it suffers legal wrong or that its injury falls within the zone of interest of the statutory provision the plaintiff claims was violated." *Citizens for Better Forestry v. U.S. Department of Agriculture*, 341 F.3d 961, 976 (9th Cir. 2003) (*internal quotations and citations omitted*).

With respect to the first prong of the test, "[a] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original). For example, an agency's failure to act or comply with statutory deadlines is enforceable under the APA. *See Center for Biological Diversity v. Abraham*, 218 F.Supp.2d at 1164 (noting that an agency's failure to act has been referred to as an exception to the final agency action requirement and holding that Department of Energy's failure to comply with statutory deadlines constitutes a failure to act enforceable under the APA). *See also*, *Norton*, 542 U.S. at 63 (court pointed out that a failure to act can be the failure to promulgate a rule or take some decision by a statutory deadline).

In this case, Plaintiffs' claims are based on Defendants' "failure to act" pursuant to the provisions of the GCRA. The GCRA's mandate regarding the deadlines for submission of the Research Plan and Assessment is clear and unequivocal. Pursuant to the GCRA's statutory mandate, the submission of the 2000 Assessment triggered a four-year deadline for an updated report. 15 U.S.C. §2936. No report was submitted to Congress in 2004. Defendants are in violation of this provision and Defendant CCSP's intention to publish 21 separate, narrowly focused reports spread out over several years after the deadline does not comply with this provision. As noted by the GAO, not only has the deadline for compliance come and gone, but issuing separate, piecemeal reports over several years would make it "difficult for the Congress and others to use this information effectively as the basis for making decisions on climate policy," which clearly undermines the intent and purpose of the GCRA. Teel Decl., Exh. 5 at pgs. 4-5 (GAO Report); Legal and Factual Background, Section II.A. *supra*. For instance, Congress' requirement that the Assessment be updated every 4 years was to ensure that global change research and the development of effective policies occurred "in parallel." *See* Speech of House Representative Roe, 136 Cong. Rec. E3593-02 at E3593 (October 27, 1990). Similarly, the Act requires that the Research Plan be updated every three years. 15 U.S.C. §2934(a). The publication of the June

1    2003 Research Plan triggered a deadline of June 2006 for a revised Plan, which has yet to be produced.

2    By failing to meet these deadlines, Defendants have severed this crucial link between the availability of

3    the program's research findings and effective, well-informed policymaking decisions and have

4    adversely affected Plaintiffs' interests as discussed fully below. *See* Argument, Section III.C, *infra*.

5         With respect to the second prong of the test for reviewability, the court in *Citizens for a Better*

6    *Forestry* explained: "[t]he APA has been held to require that the interest sought to be protected by the

7    complainant is arguably within the zone of interests to be protected or regulated by the statute or

8    constitutional guarantee in question." *Citizens for a Better Forestry*, 341 F.3d at 976.  In *Citizens,* the

9    plaintiffs filed a lawsuit alleging that the U.S. Department of Agriculture (USDA) failed to comply with

10   the procedural requirements of the National Environmental Policy Act (NEPA) and the Endangered

11   Species Act (ESA) before promulgating its national forest management policy.  Specifically, plaintiffs

12   alleged they were deprived of the opportunity to comment on the USDA's environmental assessments

13   during the rule-making process.  *Id.* at 971.  Regarding plaintiff's claims under the APA, the *Citizens*

14   court concluded that because NEPA's purpose is to protect the environment and the plaintiffs were

15   plainly trying to protect the environment, "their suit thus lies well within NEPA's zone of interests." *Id.*

16   at 976.  *See also*, *Center for Biological Diversity v. Abraham*, 218 F. Supp. 2d at 1163-1164 (court held

17   that plaintiffs' interest in cleaner air falls within the Energy Policy Act's zone of interest); *People v.*

18   *USDA*, 2006 LEXIS 72226 (N.D. Cal. 2006) (court held that plaintiffs' suit satisfied the prudential

19   standing requirements of the APA because their goal to facilitate informed decision-making by the

20   Forest Service was well within the zone of interest for NEPA and the ESA).

21        Here, Defendants' failure to publish the Assessment and Research Plan frustrates the goals and

22   purpose of the GCRA, which is to provide Congress, governmental agencies and the public with the

23   most current data and information to allow for adequate predictions and responses to global climate

24   change.  15 U.S.C. § 2931; Legal and Factual Background Section II.A, II.B. *supra*.  Plaintiffs' interest

25   in the environmental impacts of global climate change and their goals to protect species, ecosystems and

26   humans from these devastating impacts are clearly within the "zone of interests" of the GCRA.  *See,*

27   *e.g*., Siegel Decl., ¶¶3,4,8; Lee Decl., ¶¶ 4-15; Coequyt Decl., ¶¶3-8; Duchin Decl., ¶¶2-4; Fugere Decl.,

28   ¶¶3-9; Dustan Decl., ¶¶15-21.  Thus, Plaintiffs meet the standing requirements under the APA.

In light of Defendants' failure to fulfill their statutory duties under the GCRA, judicial review under the APA is proper. 5 U.S.C. §§ 701(b)(2)(a) & 702. The APA provides that "the reviewing court shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706 (1).[9] Defendants' failure to produce the required Assessment and Research Plan constitutes agency actions "unlawfully withheld" and/or "unreasonably delayed." Accordingly, Plaintiffs' prayer for declaratory and injunctive relief is appropriate in this case as the GCRA's mandate is clear and is not subject to agency discretion. Further, injunctive relief is proper because production of the Assessment and Research Plan will effectuate the congressional purpose behind the Act. *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 (9th Cir. 2002). (After a review of Supreme Court precedent, the Court noted that the "test for determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional purpose behind the statute."). In this case, the purpose of the Act is to collect, synthesize and disseminate global climate change research to promote informed policy decision-making and the development of effective policies to abate and mitigate for the impacts of global climate change. *See* Legal and Factual Background Section II.A. *supra.* An injunctive order would promote these goals.

### C.    Plaintiffs Have Standing to Bring Their Claim

#### 1.    General Rule of Law

To meet the "case and controversy" requirements under Article III of the Constitution, the Supreme Court has articulated the following three-part test:

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth v. Laidlaw,* 528 U.S. 167,180-181 (2000) *(citing Lujan v. Defenders of Wildlife*,

---

[9]    In the alternative, Plaintiffs also request this court to rule that Defendants are in violation of the Mandamus and Venue Act, 28 U.S.C. § 1361 and compel the Defendants to perform their non-discretionary duties under the GCRA.

504 U.S. 555 (1992)).  Plaintiffs meet each of these criteria for Article III standing.  As demonstrated below, Plaintiffs' standing is based on procedural, substantive and informational injuries flowing from Defendants' violations of the GCRA.

**2.     Plaintiffs Have Standing Based on Procedural Injuries**

The Supreme Court has recognized procedural injuries are a legitimate basis to confer standing for aggrieved parties.  The Supreme Court has noted that procedural rights are "special" and a person can assert standing without meeting the normal requirements for redressability and immediacy.  Also referred to as "Footnote 7 standing," the Supreme Court in *Lujan* explained:

> There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.

*Lujan*, 504 U.S. at 573 n. 7.  "To satisfy the ***injury in fact*** requirement, a plaintiff asserting a procedural injury must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Citizens for Better Forestry*, 341 F.3d at 969 (emphasis added).   Furthermore, the Plaintiff "needs [to] establish 'the reasonable probability of the challenged action's threat to [his or her] concrete interest.'" *Id.*

**a)   *Defendants Violated Procedural Rules Designed to Protect Plaintiffs' Concrete Interests***

Defendants violated two, separate procedural requirements of the GCRA.  First, Defendants failed to publish an updated Research Plan by July 2006 as mandated by Section 104 of the Act (15 U.S.C. § 2934(a)).  Second, Defendant failed to complete an Assessment in 2004 as required by Section 106 of the Act (15 U.S.C. § 2936).  These procedural requirements were designed to: promote public participation; facilitate informed policy decisions; and develop effective policies to abate, mitigate and cope with global changes.  *See* Legal and Factual Background, Section II.A. *supra*.  In addition, public participation is a requirement under both the GCRA and the CCSP's 2003 Research Plan and Guidelines.  These objectives have been effectively precluded by Defendants' failure to prepare these reports.  *See* Legal and Factual Background, Section II.B. *supra*.  *Compare with Citizens for Better*

*Forestry*, 341 F.3d at 970 (rejecting government's argument that public opportunity to comment on Environmental Assessments is hortatory).

Plaintiffs in this case are non-profit environmental groups whose members have concerns regarding the contribution of human activities to global warming and of the impacts of global warming on the environment. For example, Plaintiffs' organizational goals are to: 1) identify vulnerable species that will be most immediately affected by global warming; 2) educate, inform and mobilize the public with respect to global warming and its impact on the environment and on public health; 3) advocate before federal agencies whose policies and actions will impact greenhouse emissions and/or impact species and other resources vulnerable to climate change; 4) challenge projects which generate greenhouse gases; and 5) promote sustainable energy use. *See, e.g.,* Siegel Decl., ¶¶4, 5, 8, 13, 17; Coequyt Decl., ¶¶3-5, 8; Fugere Decl., ¶¶3-9; Duchin Decl., ¶¶3, 4, 10.

As stakeholders concerned about global warming and its impacts, Plaintiffs have an interest in participating in the development of the Research Plan and Assessment. Teel Decl., Exh. 1 at pg. 9 (2000 Assessment) & Exh. 2. at pg. 3 (2003 Research Plan); *see also*, MacCracken Decl., ¶¶11-12. The 2000 Assessment has been a vital resource in promoting Plaintiffs' interests. For example, Plaintiffs have used the 2000 Assessment to identify species and habitats that are vulnerable to climate change and have incorporated the findings in the report in their educational materials. *See generally*, Siegel Decl., ¶¶9-13; Coequyt Decl., ¶14-15; Fugere Decl., ¶¶4, 14,16-19; Lee Decl., ¶¶9-11. Now that six years have passed since the last Assessment, Plaintiffs raise concerns that the 2000 Assessment is out-dated and that Plaintiffs, federal agencies and Congress do not have the benefit of the most current information. Siegel Decl., ¶¶15-18; Coequyt Decl., ¶¶10-17; Fugere Decl., ¶¶2, 9-16; *see also*, MacCracken Decl., ¶¶15-18, 20-21.

The GCRA requires the Defendants' research findings to be provided to the Environmental Protection Agency and other agencies "for use in the formulation of coordinated national policies for responding to human-induced and natural processes of global change pursuant to other statutory responsibilities and obligations." 15 U.S.C. §2938 (b). Defendants' failure to publish a timely Assessment has precluded federal agencies from making informed policy decisions based on the best available scientific information. The only comprehensive national report on global climate change is

the 2000 Assessment, which is out-of-date considering advances in scientific knowledge over the course of the last 6 years. MacCracken Decl., ¶¶15-18. Updating the Assessment and Research Plan ensures that the program keeps up with changes in technology and scientific understanding. *Id*. at ¶¶17, 20-21. Thus, Defendants' climate change research and reporting is meant to be a continuously evolving process. *See* Comments from Rep. Roe, 136 Cong. Rec. E3593-02, E3593-3594 (October 27, 1990) ("Although the plan describes a 10-year research program, the results of that program should be consolidated and communicated frequently"); *see also*, MacCracken ¶ 17. Defendants' disregard of the GCRA's deadlines frustrates Congress' goals.

Plaintiffs' role as advocates during agency public comment periods and during rule-making proceedings are also impacted by Defendants' failure to prepare the required reports. Specifically, Defendants' failure to produce an updated Assessment and Research Plan raises concerns that agencies, which may be relying on outdated information, will not adequately address issues regarding the impacts of climate change or consider mitigating alternatives. *See, e.g.,* Siegel Decl., ¶¶17, 18; Coequyt Decl., ¶15-17; Fugere Decl., ¶¶10, 13, 15. Courts have long recognized that an agency's uninformed decision-making can cause cognizable injuries. For example, in the context of public participation requirements under the NEPA, the 9th Circuit in *Citizens for Better Forestry* held:

> This wholesale neglect of the regulations' [NEPA] mandatory inclusion of the public in the process results in a procedural injury. Moreover it undermines the very purpose of NEPA, which is to "ensure that federal agencies are informed of environmental consequences before making decisions and that the information is available to the public."

*Citizens for a Better Forestry*, 341 F.3d at 970-971. *See also, Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355 (9th Cir. 1994) (injury to plaintiff results not from agency's decision, but from the agency's uninformed decision-making); *Defenders of Wildlife v. Johann*, 2005 U.S. Dist. LEXIS 42273, *27 (N.D. Cal. 2005) (the denial of plaintiff's opportunity to comment on agency's rule was a properly alleged procedural injury); *Abraham*, 218 F.Supp. 2d at 1161 (declarants' assertion that they have lost an opportunity to participate and comment in rule-making process is a cognizable injury). Thus, uninformed agency decision-making and Plaintiffs' consequent inability to effectively advocate for the reduction of greenhouse gases and/or adaptation to global warming threaten Plaintiffs' interests.

In a similar vein, Defendants' failure to publish an updated Research Plan also interferes with Plaintiffs interests. *See, e.g.,* Siegel Decl., ¶¶14-16; Coequyt Decl., ¶17-19; Fugere Decl., ¶¶ 10-11. Defendants' disregard of this deadline is critical because the Research Plan lays the groundwork and priorities of the research program as a whole, including the preparation of the Assessment. 15 U.S.C. § 2934(b) & (c).  Revising the Research Plan on a periodic basis provides an avenue for the CCSP to respond to changing needs of scientific, research and legislative communities and the public, and to respond to advances in science.  *See, e.g.,* Dustan Decl., ¶21.  Defendants' failure to update the Research Plan calls into question whether its programmatic goals are outdated.  Plaintiff Center for Biological Diversity (CBD) for example, contends that the CCSP has placed too little emphasis on researching mitigation options to reduce greenhouse gas emissions.  Siegel Decl., ¶16; Lee Decl., ¶13. Defendants' inaction deprives Plaintiffs of the right to voice these concerns. 15 U.S.C. §2934(f); Siegel Decl., ¶16; Coequyt Decl., ¶17; Duchin Decl., ¶16; Fugere Decl., ¶11.

**b)** ***There is a Reasonable Probability that Defendants' Actions Threaten Plaintiffs' Concrete Interests.***

The concrete interest requirement can be satisfied when the plaintiff alleges, for example, that an aesthetic or recreational interest is threatened by the proposed action.  *City of Sausalito v. O'Neil*, 386 F.3d 1186, 1197 (9th Cir. 2004). The Supreme Court has held that the "desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing." *Lujan*, 504 U.S. at 562-563.  In this case, Plaintiffs' injuries stem from their concerns that global warming will have a detrimental impact on the environment as well as the health and well-being of their members, and that ill-informed agency decisions will either further contribute to the problem of global warming and/or inadequately respond to its challenges.[10]

By enacting the GCRA, Congress acknowledged that human-induced climatic changes could adversely affect agriculture, marine production, coastal habitability, biological diversity and human health.  15 U.S.C. § 2931. These impacts are supported by the findings of the 2000 Assessment, which

---

[10]   Based on *Lujan*, aesthetic, recreational, property and research interests would constitute substantive injuries in their own right and Plaintiffs assert that these injuries also constitute a separate basis for standing.

1   predicted that temperatures in the U.S. would rise significantly and have innumerable adverse

2   environmental impacts. MacCracken Decl., Exh. 1 at pgs. 10-11 (2000 Assessment Overview Report) .

3   The Assessment's predictions are supported by analogous international studies and the views of leading

4   scientific experts.  MacCracken Decl., ¶9,16, Exhs. 3 (Arctic Climate Impact Assessment 2004 Report),

5   4 (Intergovernmental Panel on Climate Change (IPCC) 2001 Report).  Since the publication of the 2000

6   Assessment, climate change experts have observed that the earth is experiencing more prolonged

7   droughts, increased damage from wildfires, and further retreat of glaciers and melting of sea ice, leading

8   many to the conclusion that the impacts of climate change are appearing sooner and with greater

9   intensity than had been previously projected. MacCracken Decl., ¶16.  Mounting scientific evidence

10  published after the 2000 Assessment contributes to Plaintiffs' concerns that anthropogenic sources of

11  greenhouse gas emissions are having severe and detrimental impacts on the environment. Siegel

12  Decl.,¶¶5-7, Exhs. 1-3, 8 (Barnett *et al.* 2005; Hansen *et al.* 2005; Hansen *et al.* 2006; IPCC 2001);

13  Coequyt Decl.,¶¶11, 21, Exhs. 1-3 (Dowdeswell 2006; Holland *et al.* 2006; Stewart *et al.* 2004).

14          For example, one of CBD's organizational goals is to identify species most immediately

15  threatened by global warming and petition for their inclusion on the endangered species list.  Siegel

16  Decl, ¶12.  CBD relied on the 2000 Assessment to identify the American Pika (*Ochotona princeps*) as a

17  vulnerable species because it described the Pika's habitat, western alpine ecosystems, as being

18  particularly vulnerable to climate change.  Siegel Decl., ¶12, Exh. 7 (2000 Assessment excerpts).   As a

19  result, CBD is petitioning to have this species listed under the Endangered Species Act ("ESA").  *Id.*

20  Plaintiffs are also concerned about the current plight of the polar bear and Caribbean corals as a result of

21  global warming and have petitioned to protect these species as well.  Siegel Decl., ¶¶17(d), 19, 20;

22  Coequyt Decl., ¶15; Dustan Decl., ¶6-11, 13-14; Duchin Decl., ¶¶5, 9-11; *see also*, MacCracken Decl.,

23  ¶9(d).  An updated and more current Assessment would assist Plaintiffs in furthering their goals of

24  species and habitat protection and would also assist them in ensuring that federal agencies are taking

25  into account global warming issues in the context of species protection, mitigation and reduction of

26  greenhouse gases, and resource management.  Siegel Decl. ¶¶17-19; Coequyt Decl., ¶¶16-17, 18; Lee

27  Decl., ¶15; Fugere Decl., ¶ 13. *See Citizens for Better Forestry*, 341 F.3d at 971-972 (*citing Salmon*

28  *River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355 (9th Cir. 1994)) (injury is established when

environmental consequences might be overlooked as a result of deficiencies in the government's analysis under environmental statutes).

Further, Defendants' failure to produce the required reports interferes with Plaintiffs' members' research and observation of species that are impacted by climate change. For example, global warming issues impact Dr. Dustan's professional and recreational interests in corals off the coast of Florida. Dustan Decl., ¶¶3-19 (professor of coral reef ecology and SCUBA diver); *see also*, Lee Decl., ¶14 (an avid SCUBA diver who explores coral reefs in the Florida Keys and elsewhere). The 2000 Assessment and other studies have identified coral bleaching as a detrimental impact of climate change. MacCracken Decl., Exh. 1 at pg. 11 (2000 Assessment Overview Report); *see also*, MacCracken Decl., ¶9(d); Dustan Decl., ¶14. Similarly, Mr. Lee's research on marine birds and mammals on the Farallon Islands is also impacted by global warming because this ecosystem is sensitive to climate change. Lee Decl., ¶4-6, 12. Defendants' failure to produce the Research Plan and Assessment impacts his ability to model and understand the impacts of climate change on the ecosystems he studies. *Id.* at ¶9-11, 13. He also raises concerns that Defendants' actions will result in a failure to mitigate and adapt to the effects of global warming by both the CCSP and federal agencies that rely on the Assessment for policy-making decisions. *Id*. at ¶¶13,15. *See also*, Duchin Decl., ¶¶10-12, 15 (Ms. Duchin's observations of polar bears and ringed seals are threatened by Defendants' actions).

Defendants' actions will also impair individual member's use and enjoyment of their property and public lands. For example, Ms. Siegel fears that global warming is causing more frequent and intense wildfires that threaten her properties, which are adjacent to National Forest and National Park land. Siegel Decl., ¶¶20-21. Defendants' failure to produce the Assessment contributes to the inability of agencies such as the U.S. Forest Service and National Park Service to plan for and adapt to changing climate conditions and will make it more likely that inadequate management will lead to increased danger from forest fires. *Id.* Similarly, Mr. Lee, who studies the impacts of forest fires on spotted owls, is concerned that the failure to produce the Assessment and Research Plan will lead to inadequate management by the U.S. Forest Service which will cause further harm to his study species from forest fires. Lee Decl., ¶15. The 2000 Assessment identified increased forest fires as a long-term impact from global warming. *See* MacCracken Decl., Exh. 1 at pgs. 10-11. Several members attest to similar injuries

to their recreational and property interests.  *See, e.g.*, Siegel Decl., ¶¶20, 21-23; Dustan Decl., ¶¶7, 10-14, 16-17; Lee Decl., ¶14; Coequyt Decl., ¶19, 20; Duchin Decl., ¶¶6-13.

In sum, Defendants' failure to prepare the Assessment and Research Plan threatens Plaintiffs' concrete interests because the agencies who are required to rely on these reports are making policy decisions based on outdated information.  Such actions increase the risk that federal agencies will not adequately take into account the effects of global warming and take appropriate steps to mitigate and plan for these effects.  *See, e.g.*, 15 U.S.C. §§ 2931 (a)(4), 2934 (d)(3), 2938 (b).

### c) *Plaintiffs Satisfy the Causation and Redressablity Requirements for Procedural Standing*

In cases of procedural harm, once a plaintiff has established an injury-in-fact "the causation and redressability requirements are relaxed."  *Public Citizen v. Department of Transportation*, 316 F.3d 1002, 1016 (9th Cir. 2002) *rev'd on other grounds*, 541 U.S. 752 (2004). "To establish standing by alleging procedural harm, the members [Plaintiffs] must show only that they have a procedural right that, if exercised, *could* protect their concrete interests and that those interests fall within the zone of interests protected by the statute at issue."  *Defenders of Wildlife v. EPA*, 420 F.3d 946, 957 (9th Cir. 2005) (emphasis in original). *See also Defenders of Wildlife v. Johann*, 2005 U.S. Dist. LEXIS 42273 (N.D. Cal. 2005)(same); *Friends of the Earth v. Watson*, 2005 U.S. Dist. LEXIS 42335, *7 (N.D. Cal. 2005) ("when, as here, a plaintiff seeks to challenge a procedural violation, some uncertainty about redressability and causality is allowed.").  The injuries alleged here are a direct result of Defendants' failure to comply with the GCRA's mandates.

As noted above, the standards for redressibility are also relaxed.  In this case, Plaintiffs' request for declaratory and injunctive relief will address their injuries.  Plaintiffs' claims regarding the inability of  the public, Congress and agencies to have access to the most current information regarding global climate change will be redressed by an order compelling Defendants to publish a revised Research Plan and Assessment by a date certain.   An order compelling the publication of the Assessment will also redress Plaintiffs' concerns that federal agencies are not making informed decisions based on an updated assessment.  *See Animal Legal Defense Fund*, 469 F.3d at 836 (*citing Citizens for Better*

*Forestry*, 341 F.3d at 976) ("redressability is satisfied where procedural compliance 'could have influenced' an agency's action"). Similarly, an order compelling Defendants to publish a revised Research Plan will redress Plaintiffs' concerns regarding their inability to comment on the sufficiency of the Plan and will ensure that the programmatic goals are in step with advances in science and the needs of policy makers.

### 3.    Plaintiffs Have Standing Based On Informational Injuries

At its core, the GCRA is an information gathering and dissemination statute.  The purpose of the GCRA is to compile, gather, and disseminate information regarding the impacts of global change.  For example, the research program's findings must be made available to the EPA and all federal agencies for use in the formulation of national policies.   15 U.S.C. § 2938(b).   The statute and the CCSP guidelines also incorporate public participation, public commentary and public disclosure into the preparation and distribution of the Research Plan and Assessment.  *See* 15 U.S.C. § 2934 (a) & (f); Legal and Factual Background, Sections II.A & B *supra*.  The inability to obtain information that is required to be publicly available has been identified by the Supreme Court as a valid basis for satisfying the injury prong of the standing test.  *See Federal Election Commission v. Akins*, 524 U.S. 11, 21 (1998) (plaintiff suffers an injury-in-fact when he/she is unable to obtain information).  *See also Center for Biological Diversity v. Abraham*, 218 F.Supp. at 1161 (same).

For example in *Abraham*, plaintiffs alleged that defendant agencies failed to prepare and publish certain compliance reports as required under the Energy Policy Act of 1992.  In addition, Defendants failed to post the reports on their websites and announce the availability of the reports in the Federal Register.  Plaintiff environmental groups produced standing declarations that stated that the information in these reports would be used to promote environmental education efforts and that the information would be useful to them in their profession.  Relying on the Supreme Court's decision in *Akins*, the *Abraham* court concluded that the declarations stated sufficient injuries for standing purposes.  *Id*. at 1161.[11]

---

[11]    The Plaintiffs in *Abraham* also claimed procedural injuries for separate claims.  As such, this decision addresses both procedural and informational injuries.  *Abraham*, 218 F.Supp. 1163-1164 (court's analysis of procedural injuries resulting from Defendants' failure to issue regulations within statutory deadlines).

Like the plaintiffs in *Abraham*, Plaintiffs in this case have suffered injuries due to their inability to obtain the information Defendants are required to make publicly available. 15 U.S.C. §2934(f); Teel Decl., Exh. 1 at pg. 27 (2003 Research Plan), Exh. 3 at pgs. 8-10 (CCSP Guidelines). Such information would be used by Plaintiffs to: 1) promote their interests in species and habitat conservation and public health protection; 2) educate their members and the public of the impacts and current state of knowledge regarding global warming; 3) advocate before federal agencies who are required to rely on this information to develop policies and make sound decisions; and 4) provide their input regarding the contents of the Assessment and Research Plan as contemplated under 15 U.S.C. §2934(f). *See, e.g.*, Siegel Decl., ¶¶8-13, 16-20; Coequyt Decl., ¶¶12-17; Fugere Decl., ¶¶14,16-19; Lee Decl., ¶¶9-11; Duchin Decl., ¶¶3-4, 15-16. *Compare with Center for Biological Diversity v. Abraham*, 218 F.Supp. 2d at 1161. The information in the Assessment is of interest to Plaintiffs because they view it as an authoritative source on climate change issues. *See, e.g.*, Siegel Decl., ¶9; Coequyt Decl., ¶10; *see also*, MacCracken Decl., ¶13.

The causation and redressability requirements are also satisfied. The Supreme Court in *Akins* explained that, in the case of informational injuries, the harm asserted should be "fairly traceable" to the agency decision. *Akins*, 524 U.S. at 25. In cases of informational injuries, causation and redressability issues are straightforward once the plaintiff is able to establish that it has satisfied the injury-in-fact requirement. *See, e.g.*, *id.* at 25. Plaintiffs have regularly participated during agency comment periods for activities that relate to global warming issues, including CCSP activities, and Plaintiffs intend to continue their participation in this process. *See, e.g.*, Siegel Decl., ¶¶17, 23, 25; Coequyt Decl., ¶¶16, 17, 21-22. Given that this information is required to be made publicly available under the statute and CCSP's 2003 Research Plan and Guidelines, the link between Defendants' failure to produce an updated Assessment and Research Plan is fairly traceable to the harm to Plaintiffs' interests. Specifically, Defendants' failure to provide an updated Assessment and  Research Plan prevents Plaintiffs from: 1) meaningfully participating in the public commenting process for the Research Plan and Assessment; 2) meaningfully participating in the public commenting process for agency actions which are required by statute to consider the findings of the Assessment; 3) disseminating the findings of the Assessment to their members and the public in general; 4) aiding and educating their members on

global climate change issues; and 5) using the conclusions from the Assessment to identify habitats and species that are vulnerable to climate change. *See, e.g.*, Siegel Decl., ¶¶8-19; Coequyt Decl., ¶¶13-19; Fugere Decl., ¶11, 13-19; Duchin Decl., ¶¶4, 15-16.   The remedy Plaintiffs seek will redress the informational injuries alleged because the production of these reports will assist Plaintiffs and their members in furthering these interests.

**IV.     CONCLUSION**

Based on the foregoing arguments, Plaintiffs respectfully request this Court to grant their Motion for Summary Judgment and order Defendants to produce the required updated Research Plan and Assessment within nine months of this Court's Order on Plaintiffs' Motion.


Date: January 22, 2007

Respectfully submitted,


/s/ Julie Teel
_____
Julie Teel (CA Bar No. 208282)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 7745
San Diego, CA 92167
Phone: (619) 224-3400
Facsimile: (619) 224-3700
Email: jteel@biologicaldiversity.org

Brendan Cummings (CA Bar No. 193952)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252
Phone:   (760) 366-2232
Facsimile: (760) 366-2669
Email: bcummings@biologicaldiversity.org

Attorneys for Plaintiffs