1

2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

3

4

5

6

7

8

9

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

         *Plaintiffs*,

  v.

DR. WILLIAM BRENNAN, *et al.*,

         *Defendants*.

No.  C 06-7062 SBA

**ORDER**

10

11

12

13

14

15

16

17

     Before the Court is the plaintiffs' motion for summary judgment [Docket No. 7]; the defendants' motion to dismiss for lack of jurisdiction/alternative motion for summary judgment [Docket No. 48]; and a motion to intervene by Senator John Kerry and Congressman Jay Inslee [Docket No. 53].  After reading and considering the arguments presented by the parties, the Court finds these matters appropriate for resolution without a hearing.  *See* FED. R. CIV. P. 78.  For the reasons that follow, the plaintiffs' motion for summary judgment is GRANTED; the defendants' motion to dismiss for lack of jurisdiction/ alterative motion for summary judgment is DENIED; and the motion to intervene is DENIED.

18

19

                               **BACKGROUND**

20

21

22

     This matter of first impression concerns executive branch compliance with the provisions of the Global Change Research Act of 1990 (GCRA), 15 U.S.C. §§ 2921-2961, and the standing of three environmental organizations and two legislators to enforce the terms of the Act.

23

24

25

> In 1990, Congress enacted the Global Change Research Act . . . which established a ten-year research program for global climate issues, *id*. § 2932, directed the President to establish a research program "to improve understanding of global change," *id*. § 2933, and provided for scientific assessments every four years that "analyze[ ] current trends in global change," *id*. § 2936(3).

26

*Connecticut v. American Elec. Power Co.*, 406 F. Supp. 2d 265, 269 (S.D.N.Y. 2005).

27

28

     The stated purpose of the Global Change Research Act "is to provide for development and coordination of a comprehensive and integrated United States research program which will assist the

Nation and the world to understand, assess, predict, and respond to human-induced and natural processes of global change."[1]  15 U.S.C. § 2931(b).  To that end, the Act requires periodic preparation and submission of (1) a National Global Change Research Plan that "shall contain recommendations for national global change research" and shall establish "the goals and priorities for Federal global change research which most effectively advance scientific understanding of global change and provide usable information on which to base policy decisions related to global change," and (2) a Scientific Assessment analyzing the effects of global climate change.  *See* 15 U.S.C. §§ 2934, 2936.  It is these periodic reports that are in dispute.

"The Chairman of the Council shall submit the [Research] Plan to the Congress within one year after November 16, 1990, and a revised Plan shall be submitted at least once every three years thereafter."  15 U.S.C. § 2934(a).  The defendants have not prepared a new Research Plan or Scientific Assessment within the time frame set by the Act.  *See* Docket No. 17, Ex. 5 (April 14, 2005 Report by the U.S. Government Accountability Office (GAO)).  The last Research Plan issued was in July 2003.[2]  *See* Docket No. 17, Ex. 1a, 1b (*A Report by the Climate Change Science Program and the Subcommittee on Global Change Research*).  The statute required a revised Research Plan by July 2006.  None has been forthcoming.

Another provision of the Act requires the periodic preparation of a Scientific Assessment of global change.  Title 15 U.S.C. § 2936 imposes the following obligations:

> On a periodic basis (not less frequently than every 4 years), the Council, through the Committee, shall prepare and submit to the President and the Congress an assessment which—
>
> **(1)**   integrates, evaluates, and interprets the findings of the Program and discusses the scientific uncertainties associated with such findings;
>
> **(2)**   analyzes the effects of global change on the natural environment, agriculture, energy production and use, land and water resources, transportation, human

---

[1]   "Global change" is defined by the Act to mean "changes in the global environment (including alterations in climate, land productivity, oceans or other water resources, atmospheric chemistry, and ecological systems) that may alter the capacity of the Earth to sustain life."  15 U.S.C. § 2921(3).

[2]   The 2003 Research Plan is available at http://www.climatescience.gov/Library/stratplan2003/.

1
2

                health and welfare, human social systems, and biological diversity; and
**(3)**    analyzes current trends in global change, both human-[induced] and natural, and projects major trends for the subsequent 25 to 100 years.

3 The last Scientific Assessment was published on October 31, 2000, and submitted to the

4 Congress in November 2000. *See* Docket No. 17, Ex. 5 (April 14, 2005 Report by the GAO); 65 Fed.

5 Reg. 75319-01 (Dec. 1, 2000), 2000 WL 1759412.[3] A new assessment was due in November 2004. *See*

6 Docket No. 17, Ex. 5 (April 14, 2005 Report by the GAO). As with the Research Plan, this deadline

7 has lapsed. The Scientific Assessment is now more than two and a half years late.

8 The plaintiffs are the Center for Biological Diversity, Greenpeace, Inc., and Friends of the Earth.

9 They bring this action seeking declaratory and injunctive relief, primarily to declare the defendants in

10 violation of the Global Change Research Act and to compel the defendants to issue the Research Plan

11 and Scientific Assessment as directed by statute. *See* Docket No. 1 (Compl., at 18). In their complaint,

12 the plaintiffs assert this Court has jurisdiction pursuant to the federal question statute (28 U.S.C. §

13 1331); the Administrative Procedure Act (5 U.S.C. § 706); and the Mandamus and Venue Act of 1962

14 (28 U.S.C. § 1361). *See* Docket No. 1 (Compl. ¶ 7).

15 The defendants are Dr. William Brennan, Acting Director of the United States Climate Change

16 Science Program (sued in his official capacity); the United States Climate Change Science Program;

17 John Marburger III, Director of the Office of Science and Technology Policy and Chairman of the

18 Federal Coordinating Council on Science, Engineering, and Technology (sued in his official capacity);

19 the Office of Science and Technology Policy; and the Federal Coordinating Council on Science,

20 Engineering, and Technology.[4] In response to the complaint, the defendants assert that they have

21 "initiated the process for producing a revised Research Plan" and that they "are in the process of issuing

22 21 Assessment and Synthesis reports that will fulfill the requirements [to produce a Scientific

23

24 [3] An overview of the 2000 Scientific Assessment is available at http://www.usgcrp.gov/usgcrp/Library/nationalassessment/overviewfindings.htm/.

25

26 [4] Congress assigned a number of functions under the Act to the Federal Coordinating Council on Science, Engineering, and Technology. The responsibilities of the Federal Coordinating Council on Science, Engineering, and Technology were later assumed by the Climate Change Science Program in 2002.

27

28 3

Assessment]."  Docket No. 49, at 2.  The defendants relate that the Climate Change Science Program intends to "complete those reports necessary to comply with section 106 [the Scientific Assessment] by the end of 2007, and the reports not necessary to meet the requirements of section 106 in 2008."  Docket No. 49, at 4.

But regardless of whether they have acted in a timely manner, the defendants contend the plaintiffs lack standing to sue for enforcement of the GCRA or to compel the production of the Research Plan and the Scientific Assessment.  The defendants argue that because the GCRA does not contain a "citizen-suit" provision, the Act does not allow for enforcement by third-party, private organizations such as the plaintiffs.  They further argue that whether the Executive Branch sufficiently delivers information requested by Congress is best determined by Congress.  The defendants therefore challenge both the plaintiffs' Article III standing and their statutory standing under the Administrative Procedure Act and/or the Mandamus and Venue Act of 1962.

A.        **THE DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING/ ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**

### ARTICLE III STANDING

Article III of the Constitution limits the judicial power of the United States to the resolution of "Cases" and "Controversies."  *See DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1860-61 (2006). One element of the case-or-controversy requirement is that plaintiffs, based on their complaint, must establish they have standing to sue.  *See Raines v. Byrd*, 521 U.S. 811, 818 (1997).  To satisfy Article III standing, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180-81 (2000); *Citizens for Better Forestry v. U.S. Dep't of Agriculture*, 341 F.3d 961, 969 (9th Cir. 2003).  "For purposes of ruling on a motion to dismiss for want

4

of standing," the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also Tyler v. Cuomo*, 236 F.3d 1124, 1131 (9th Cir. 2000).

**1.     Injury in Fact**

The plaintiffs allege two types of injuries: a "procedural injury" resulting from the lack of public participation and comment on the development of the Research Plan and the Scientific Assessment, and an "informational injury" due to the defendants' failure to disseminate these reports.

**a.     Procedural Injury**

To satisfy the injury in fact requirement, a plaintiff asserting a procedural injury must show that the procedures in question are designed to protect some threatened concrete interest and the reasonable probability of the challenged action's threat to his or her concrete interest. *See Citizens for Better Forestry*, 341 F.3d at 969; *Public Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1015 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 752 (2004); *see also Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947, 951-53 (7th Cir. 2000) (the denial of a procedural right to participate in the rule-making process on a subject impacting the plaintiffs' enjoyment of an affected area may serve as basis establishing standing).

In a case justifiably given a fair amount of attention by both parties, *Citizens for Better Forestry v. United States Department of Agriculture*, 341 F.3d 961, 970 (9th Cir. 2003), the Ninth Circuit recognized a procedural injury based on the right to public participation under the National Environmental Policy Act (NEPA). The Ninth Circuit noted that under NEPA regulations, the public must be given an opportunity to comment on draft Environmental Assessments and Environmental Impact Statements. *Id.* The court explained:

> Standing may properly hinge on this type of injury. We have determined that an environmental plaintiff was "surely . . . harmed [when agency action] precluded the kind of public comment and participation NEPA requires in the EIS process," and that this type of "procedural" injury is tied to a substantive "harm to the environment" --- "the harm consists of added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision on the environment. NEPA's object is to minimize that risk, the risk of uninformed choice . . . .'" *West v. Sec'y of Dep't of*

5

1      *Transp.*, 206 F.3d 920, 930 n.14 (9th Cir. 2000) (quoting *Sierra Club v. Marsh*, 872 F.2d
       497, 500 (1st Cir. 1989)).
2      *Citizens for Better Forestry*, 341 F.3d at 971.

3             The defendants distinguish *Citizens for Better Forestry* on the grounds that NEPA provides for

4      extensive inclusion of the public, while the GCRA allows only limited public participation.  According

5      to the defendants:

6             the limited public participation provided in section 2934(f) of the GCRA does not entitle
              [the plaintiffs] to the Research Plan.  The plain language of section 2934(f) provides only
7             that, at least "90 days before" submission of the Plan or a revision of the Plan, "a
              *summary* of the proposed Plan shall be published in the Federal Register for a public
8             comment period of not less than 60 days."  15 U.S.C. § 2934(f) (emphasis added).
              Plaintiffs in their Complaint and in their request for relief are seeking to compel the
9             submission of the final Research Plan.  Section 2934(f) does not give them the right to
              that Plan, thus they lack standing to compel its submission.
10

       Docket No. 58, at 9.
11

12            The attempt to distinguish procedural injuries based on the extent of public participation is not

13     persuasive.  It is a distinction of doubtful pedigree, as the defendants point to no paternity for this

14     proposition in either a statute or a case.  The opportunity for public participation in the Research Plan,

15     limited or not, is a Congressional dictate.  "[T]he Committee *shall* consult with . . . environmental

16     groups [and] a summary of the proposed Plan *shall* be published in the Federal Register for a public

17     comment period . . . ."  15 U.S.C. § 2934(f) (emphasis supplied).  This subsection is in fact titled "Public

18     participation."  If the defendants fail to develop such a plan within the three-year period required by

19     statute, the plaintiffs suffer the loss of consultation and public comment, a procedural injury akin to that

20     recognized by *Citizens for Better Forestry*.  *Citizens for Better Forestry*, 341 F.3d at 970 ("This

21     wholesale neglect of the regulations' mandatory inclusion of the public in the process results in a

22     procedural injury"); *see also Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1380 (9th Cir. 1986) (finding

23     that five environmental groups had standing to challenge alleged agency violations of procedural rights

24     to review and comment on draft documents under NEPA); *Defenders of Wildlife v. Johanns*, 2005 WL

25     2620564, at *9 (N.D. Cal. 2005) (finding a properly alleged procedural injury where the plaintiffs were

26     denied notice and the opportunity for comment on an interpretative rule dealing with the National Forest

27     Management Act).  That the defendants characterize the public involvement in the Research Plan as less

28                                                      6

extensive than other environmental statutes does little to alter the fact the statute mandates consultation and the opportunity for public comment. *Cf. Citizens for Better Forestry*, 341 F.3d at 970 (whatever minimum level of public comment and participation was required, a complete failure to involve or inform the public violated regulations and resulted in a procedural injury). The defendants are not free to carve out an extra-statutory *de minimus* exception. *Cf. id.* (rejecting argument that public comment requirements were "hortatory").

Other sections of the Act also clearly show that the public involvement envisioned by Congress in drafting the GCRA is not as limited as the defendants suggest. For instance, the Act establishes a Committee on Earth and Environmental Sciences and directs this Committee to "work with academic, State, industry, and other groups conducting global change research, to provide for periodic public and peer review of the Program." 15 U.S.C. § 2932(e)(4). The Committee is also to "consult with actual and potential users of the results of the Program to ensure that such results are useful in developing national and international policy responses to global change." 15 U.S.C. § 2932(e)(6).

The defendants' fallback argument is that public participation is required only if and when they produce a Research Plan. This too is unpersuasive. The extension of this reasoning is that if the defendants never produce a Research Plan, the plaintiffs never have any right to engage in consultation or public comment and therefore never suffer a procedural injury. This certainly is not in keeping with the "public participation" outlined in 15 U.S.C. § 2934(f), and the complete failure to develop a Research Plan hardly mollifies the injury to the procedural right to participate in its development. Moreover, the Act imposes an affirmative duty on the defendants to produce the Research Plan on a periodic basis, so public participation is not a contingency that may be indefinitely postponed. Therefore, the plaintiffs have identified a procedural injury for purposes of standing with respect to the Research Plan.

The Scientific Assessment (15 U.S.C. § 2936), however, does not contain a similarly explicit provision for public consultation or public comment period. A procedural injury premised on an untimely Scientific Assessment is less immediately apparent, but its existence is nonetheless discernible

from a careful examination of the statute. The Scientific Assessment must "integrate[ ], evaluate[ ], and interpret[ ] the findings of the Program . . . ." 15 U.S.C. § 2936(1). The Global Change Research "Program shall be implemented by the [Research] Plan developed under section 2934 of this title." 15 U.S.C. § 2933. The Research Plan provides for public participation. Thus, if there is no consultation or comment period in the development of the Research Plan, the Scientific Assessment will not integrate, evaluate, and interpret the findings of the Program as required.

Accordingly, there exists an indirect public participation in the preparation of the Scientific Assessment, and a procedural injury springs from the lack of this participation. Admittedly, the statute speaks of the "findings of the Program" rather than the "findings of the Plan." So the exact findings incorporated into the Scientific Assessment are not definitively set forth by the text. But "program" does appear to refer to the entirety of the United States Global Change Program. "Findings of the Program" would therefore appear to encompass all the science developed as a result of the program, including the Research Plan.

This understanding of the statute is the most natural and logical when reading the GCRA as a whole. *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 438 F.3d 937, 943 (9th Cir. 2006) (when looking to the plain language of a statute, a court does more than view words or subsections in isolation; it derives meaning from context, and this requires reading the relevant statutory provisions as a whole); *American Bankers Ass'n v. Gould*, 412 F.3d 1081, 1086 (9th Cir. 2005) (the words of a statute must be read in their context and with a view to their place in the overall statutory scheme). Section 2933 of the Act directs the creation of the United States Global Change Research Program. It also states that the "Program shall be implemented by the [Research] Plan developed under section 2934 of this title." 15 U.S.C. § 2933. Section 2934 tells us that the Research Plan is to have specific content, provide for a minimum number of research elements, manage information with the Federal Government and among nations, and, as already discussed, include public participation. The research elements of the Research Plan are to include, but are not limited to, the following:

> **(1)** Global measurements, establishing worldwide observations necessary to understand the physical, chemical, and biological processes responsible for

8

changes in the Earth system on all relevant spatial and time scales.

**(2)**    Documentation of global change, including the development of mechanisms for recording changes that will actually occur in the Earth system over the coming decades.

**(3)**    Studies of earlier changes in the Earth system, using evidence from the geological and fossil record.

**(4)**    Predictions, using quantitative models of the Earth system to identify and simulate global environmental processes and trends, and the regional implications of such processes and trends.

**(5)**    Focused research initiatives to understand the nature of and interaction among physical, chemical, biological, and social processes related to global change.

15 U.S.C. § 2934(c).

The plaintiffs argue, and the Court is persuaded, that the "findings of the Program" are the fruits of these various research activities called for in the Research Plan.  This reading of the Act gives full effect to the Scientific Assessment and the text of the statute calling for the findings of the Program to be integrated, evaluated, and interpreted.  *Cf. Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1024 (9th Cir. 2005) (in analyzing the statutory provision in the context of the governing statute as a whole, presumption is Congressional intent to create a coherent regulatory scheme); *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1175 (9th Cir. 2002) (it is an elementary canon of construction that an interpretation which gives effect to all sections of a statute is preferred).  This reading of the Act also illuminates the connection between the Plan and the Assessment, and that the Assessment will potentially be shaped, even if in small part, by public participation in the Plan.

The defendants do not deny there is a connection between the Plan and the Assessment, but they assert that it is too attenuated to support standing.  *See* Docket No. 73, at 4.  They argue that

any connection between Plaintiffs' alleged injury arising from their lack of opportunity to comment on a revised Research Plan and the allegedly delayed submission of the Scientific Assessment to Congress is too attenuated to support standing.  As [previously explained], . . . the research conducted pursuant to the Research Plan, and thus, any findings from that research that would be evaluated in the Scientific Assessment, are dependent on the intervening choices of Congress to fund particular research.

*Id.*

In other words, because Congress may not fully adopt the recommendations of the Research

9

Plan, and may set its own priorities in funding research, there really is no concrete injury to the plaintiffs. This misapprehends the nature of the injury. There is nothing in the statute guaranteeing that any comments by the public will be ultimately adopted as policy. What the statute does guarantee is a right of the public to participate in the process. Even if the plaintiffs' comments are rejected, the Act contemplates that public participation will at least inform the two end products of the Act, namely, the Research Plan and the Scientific Assessment. Accordingly, the plaintiffs have adequately alleged a procedural injury with respect to the Scientific Assessment, as well as the Research Plan.

### b.    Informational Injury

The second type of injury upon which the plaintiffs premise their standing to sue under the GCRA is "informational injury." "It is well settled that plaintiffs may suffer injury as a result of a denial of information to which they are statutorily entitled." *Fund for Animals v. Norton*, 295 F. Supp. 2d 1, 8 (D.D.C. 2003); *see also Federal Election Comm'n v. Akins*, 524 U.S. 11, 22 (1998) (recognizing that a purely informational injury may be sufficient to confer standing where a statute protected individuals from "failing to receive particular information about campaign-related activities"); *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) (finding informational injury standing based on information subject to mandatory public disclosure).

In response, the defendants note that there is a difference between statutes dictating certain information be made available to the general public and statutes requiring only reporting to Congress. The latter "reporting-to-Congress" obligations are not judicially reviewable. *See, e.g., Guerrero v. Clinton*, 157 F.3d 1190, 1195-96 (9th Cir. 1998); *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 316-19 (D.C. Cir. 1988). This is because an agency obligation to report to Congress is not a typical agency action subject to the presumption of judicial review, and because the adequacy and sufficiency of such agency reporting is best left to Congress to determine and rectify if necessary. *See Guerro*, 157 F.3d at 1195-96.

The Research Plan requires more than merely reporting to Congress; it also requires publication

10

of a summary and the opportunity for public comment.  The Act directs that "a summary of the proposed Plan *shall* be published in the Federal Register for a public comment period . . . ."  15 U.S.C. § 2934(f) (emphasis supplied).  The fact that a summary, as opposed to the final product, is required to be published is of little import.  The expressed purpose of publishing a summary is to elicit substantive public comment and for those comments to be taken into account in the final draft of the Research Plan. Whether or not the plaintiffs have a legal claim to the information in the final draft, they do have a statutory right to a summary of the plan under consideration and a chance to offer comments on the substance of that proposed plan.  If no summary of the plan is published, then the plaintiffs have suffered an informational injury.

However, there does not appear to be a similar informational injury with respect to the Scientific Assessment.  The Scientific Assessment contains no provision for public disclosure, as the Act directs only that it be submitted "to the President and the Congress."  15 U.S.C. § 2936.  Nevertheless, the plaintiffs insist the Scientific Assessment is required to be made public and to be subject to public comment under the Climate Change Science Program's 2003 Research Plan and Guidelines.  A review of these guidelines does indeed show unequivocal pledges of public disclosure and public participation in crafting the Scientific Assessment.  For instance, one of the listed purposes of the guidelines is "Early and continuing involvement of stakeholders," a group broadly defined to include individuals and groups whose interests are affected by climate change.  Docket No. 17, Ex. 3 (Teel Decl. at 2, 6).  Moreover:

> Stakeholders participate during the scoping process by providing information that helps define the audience and potential uses of a product.  In addition, stakeholders provide comments on the prospectus, and on the product during the public comment period. These comments are expected to focus on how well the product serves its intended purpose or use.

*Id*. at 6.

The guidelines lay out a detailed procedural process of preparing drafts, facilitating expert peer review, and soliciting public comment "to ensure that the products are shaped by scientific considerations," as well as redrafting.  *Id*. at 9.  One noteworthy step states:

> The lead agency(ies) post the second draft of the product for public comment for not less than 45 days.  Any stakeholders (plus experts who participated in the expert peer review

11

process) may participate in the public comment period for the second draft. This includes governmental and non-governmental entities. The prospectus will include the expected dates of the public comment period. Notice of the public comment period will be disseminated on the CCSP web site, in the Federal Register, and through other publications, web sites, and means as appropriate to the product, to encourage wide public participation in the review. All comments will be publicly available.

*Id*. at 9-10.

Despite the unambiguous commitment to public participation and comment in developing the Scientific Assessment, the Court does not have the authority to enforce these guidelines. A court will not review allegations of noncompliance with an agency statement that is not binding on an agency; a court will review only those pronouncements that actually have the force and effect of law. *See United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1167 (9th Cir. 2000); *Western Radio Servs. Co. v. Espy*, 79 F.3d 896, 900 (9th Cir. 1996). To have the force and effect of law, an agency pronouncement must (1) prescribe substantive rules---not interpretive rules, general statements of policy or rules of agency organization, procedure, or practice---and, (2) conform to certain procedural requirements, such as being promulgated pursuant to a specific statutory grant of authority by Congress, or the notice and comment rule-making procedures of the APA. *See Lowry v. Barnhart*, 329 F.3d 1019, 1022 (9th Cir. 2003) (procedures were akin to agency guidance manuals previously held not enforceable); *Alameda Gateway*, 213 F.3d at 1168 (engineering "regulation" was not binding on the Army Corps of Engineers because it was a general policy rather than a substantive rule); *Western Radio Servs.*, 79 F.3d at 900-01 (manual and handbook did not have the force and effect of law because they were not published in the Federal Register or the Code of Federal Regulations in accordance with notice and comment rule-making). The guidelines do not have the force and effect of law because they were not promulgated pursuant to the notice and comment rule-making procedures of the Administrative Procedure Act, nor published in the Federal Register or Code of Federal Regulations.

The statement found and advanced by the plaintiffs that "Having chosen to promulgate the *DPS Policy*, the FWS must follow that policy," is not helpful to their position. *National Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003). The Fish and Wildlife Service published the "DPS" or "distinct population segment" policy in the Federal Register and it was subject to notice and

12

comment rule-making.  *See National Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 562 (D. Vt. 2005);

*Maine v. Norton*, 257 F. Supp. 2d 357, 385 (D. Me. 2003).  The "DPS" policy is legally binding and

therefore has the force and effect of law.  *See Northwest Ecosystem Alliance v. U.S. Fish & Wildlife

Serv.*, 475 F.3d 1136, 1142-43 (9th Cir. 2007).  The same is not true of the 2003 guidelines.

Accordingly, the Court may not review the defendants' noncompliance with the Climate Change

Science Program's 2003 Research Plan and Guidelines, no matter how at odds their public

pronouncements have been with their actions.  Because these guidelines do not have the force and effect

of law, the defendants' noncompliance does not trigger a legally cognizable informational injury.

In sum, then, the plaintiffs have demonstrated both a "procedural injury" and "informational

injury" with respect to the unproduced Research Plan, and a "procedural injury" from the undelivered

Scientific Assessment.  They have not, however, identified an "informational injury" from the stalled

Scientific Assessment.

### c.    Plaintiffs' Concrete Interests and the Zone of Interests Protected by the GCRA

"To establish standing by alleging procedural harm, the members must show only that they have

a procedural right that, if exercised, *could* protect their concrete interests and that those interests fall

within the zone of interests protected by the statute at issue." *Defenders of Wildlife v. U.S. Envtl. Prot.

Agency*, 420 F.3d 946, 957 (9th Cir. 2005) (emphasis in original), *rev'd on other grounds*, 127 S. Ct.

2518 (2007); *see also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 779 (9th Cir. 2006); *Public

Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1015 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 752

(2004).  The zone of interests test is "not meant to be especially demanding." *Clarke v. Sec. Indus.

Ass'n*, 479 U.S. 388, 399 (1987).  The plaintiffs need only show that their interests share a "plausible

relationship" to the policies underlying the GCRA.  *See Ocean Advocates v. U.S. Army Corps of Eng'rs*,

402 F.3d 846, 861 (9th Cir. 2005).  The zone of interests test is satisfied unless the plaintiffs' "interests

are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be

reasonably assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399.  Moreover, the

inquiry is not whether "Congress specifically intended to benefit the plaintiff," but rather whether the

13

1  plaintiff's interest affected by the agency action falls among the interests arguably protected by the

2  statutory provisions at issue. *National Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S.

3  479, 492 (1998).

4        The plaintiffs in this action are three environmental groups "whose members have concerns

5  regarding the contribution of human activities to global warming and of the impacts of global warming

6  on the environment." Docket No. 8, at 15. The plaintiffs contend that their "injuries stem from their

7  concerns that global warming will have a detrimental impact on the environment as well as the health

8  and well-being of their members, and that ill-informed agency decisions will either further contribute

9  to the problem of global warming and/or inadequately respond to its challenges." *Id*. at 17.

10        In addition, the plaintiffs declare that "Defendants' failure to produce the required reports

11  interferes with Plaintiffs' members' research and observation of species that are impacted by climate

12  change." *Id*. at 19. For instance, Dr. Phillip Dunstan, a member of Friends of the Earth, alleges that his

13  professional interests as a professor of coral reef ecology and his recreational interests as a SCUBA

14  diver are impacted by the effects of global warming on the corals off the coast of Florida. *See* Docket

15  No. 12 (Dunstan Decl.). He declares that "[c]limate change is currently harming and will continue to

16  harm me because its effects contribute to diminished opportunities for fundamental biological research

17  and my ability to pursue my profession." *Id*. at ¶ 16. Derek Lee, a member of the Center for Biological

18  Diversity, has declared that his personal and professional interests are similarly affected. *See* Docket

19  No. 14 (Lee Decl.). Lee asserts the impact of global warming will be detrimental to the marine birds

20  and mammals he researches on the Farallon Islands, and thus, detrimental to his research projects, and

21  that the failure to produce the Research Plan and Scientific Assessment will lead to inadequate

22  management by the U.S. Forest Service of forest fires impacting land in the western United States where

23  he lives, studies, and recreates. *Id*. Kassia Siegel, director of the Center for Biological Diversity,

24  contends that her professional interests are harmed by not being able to comment on the Research Plan,

25  and that her properties in California, which are adjacent to National Forest and National Park land, are

26  subject to more frequent and more intense wildfires due to global warming. *See* Docket No. 16 (Siegel

27

28                                         14

Decl.).  She also maintains that as the director of the Center for Biological Diversity, the failure of the defendants to provided updated information on global climate change impacts her ability to effectively advocate for policies on behalf of the Center before federal and state agencies and to educate the general public.  She also declares that her recreational cross-country skiing in Alaska is disrupted due to decreasing snow pack.

An at-risk esthetic or recreational interest in a particular place, animal, or plant species may satisfy the injury prong of standing.  *See, e.g., Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).  For instance, in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992), the Supreme Court stated that the "desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."  And in *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004), the Ninth Circuit determined that a procedural injury existed where a plaintiff alleged a proper Environmental Impact Statement was not prepared under the National Environmental Policy Act and where the plaintiff claimed an esthetic and recreational interest was threatened by the proposed action.

It follows that the desire to use or observe an animal species for research purposes is likewise a cognizable interest for purposes of standing.  The "desire to use, observe, and study the stated plant and animal species is undeniably a cognizable interest for purposes of standing."  *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1172 (9th Cir. 2002).  More broadly, in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000), the Supreme Court held that concern over the environmental effects of pollution is sufficient to confer standing.

Congress enacted the GCRA "to provide for development and coordination of a comprehensive and integrated United States research program which will assist the Nation and the world to understand, assess, predict, and respond to human-induced and natural processes of global change."  15 U.S.C. § 2931(b).  Congress found that "global change . . . may significantly alter the Earth habitat within in a few human generations" and that "these consequences could adversely affect world agriculture and marine production, coastal habitability, biological diversity, human health, and global economic and

15

social well-being." 15 U.S.C. § 2931(a).  The plaintiffs' interests therefore share a plausible relationship to the purposes of the GCRA.  *Cf. Citizens for Better Forestry*, 341 F.3d at 976.  ("Citizens are plainly trying to protect the environment, and their suit thus lies well within NEPA's zone of interests").  The plaintiffs have a procedural right to participate in the process of a research plan concerning global climate change.  That right, if exercised, *could* protect their concrete interests.  These interests fall within the zone of interests protected by the GCRA.

## 2.    Traceability and Redressability

Reliance on procedural harms relaxes a plaintiff's burden on the traceability and redressability prongs of the Article III standing test.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992) ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards"); *Citizens for Better Forestry*, 341 F.3d at 972; *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001).

The Ninth Circuit has declared that a petitioner asserting inadequacy of a government agency's environmental studies need not show that further analysis by the government would result in a different conclusion; it suffices that the agency's decision could be influenced by the environmental considerations that the relevant statute requires an agency to analyze or evaluate.  *See Citizens for Better Forestry*, 341 F.3d at 976; *Public Citizen*, 316 F.3d at 1019.  Here, at the very least, the issuance of a Research Plan could result in action favorable to the plaintiffs' interests, as the Research Plan "shall contain the recommendations for national global change research" and shall establish "the goals and priorities for Federal global change research which most effectively advance scientific understanding of global change and provide usable information on which to base policy decisions related to global change."  *See* 15 U.S.C. § 2934.  The defendants' failure to produce the Research Plan undermines the plaintiffs' participation in the process and the possibility of influencing environmental policy.

As a result, the Court finds the plaintiffs' procedural and informational injuries can be directly traced to the defendants' failure to issue a revised Research Plan and Scientific Assessment and that

16

1  injunctive relief would redress these injuries.  Therefore, the plaintiffs have adequately demonstrated

2  Article III standing to pursue their claims dealing with the Research Plan and Scientific Assessment.

3

4                                    ORGANIZATIONAL STANDING

5       Because the plaintiffs are organizations, they must also satisfy three additional prerequisites to

6  sue on behalf of their members.  *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171 (9th

7  Cir. 2002).  Associations, such as the Center for Biological Diversity, Greenpeace, Inc., and Friends of

8  the Earth, have standing to sue on behalf of theirs members who have individual standing if the interests

9  at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested

10  requires the participation of individual members in the lawsuit.  *See Defenders of Wildlife*, 420 F.3d at

11  957; *Badgley*, 309 F.3d at 1171.

12

13  **1.    Individual Standing**

14       As related above, three individuals of the plaintiff organizations, Dunstan, Lee, and Siegal, have

15  alleged concrete injuries and harm resulting from the defendants' conduct.[5]  They would therefore

16  otherwise have standing to sue on their own behalf.  *See Badgley*, 309 F.3d at 1171-72.

17

18  **2.    Interests Germane to the Purposes of the Organizations**

19

20  _____

21  [5]  Only one of the plaintiffs needs to have standing to satisfy Article III's case-or-controversy
     requirement.  *See Massachusetts v. Environmental Prot. Agency*, 127 S. Ct. 1438, 1453 (2007)
22  ("Only one of the petitioners needs to have standing to permit us to consider the petition for
     review"); *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("the
23  presence of one party with standing is sufficient to satisfy Article III's case-or-controversy
     requirement").  Thus, it is not necessary to identify the standing of individual members of all
     three plaintiffs.  *See Clinton v. City of New York*, 524 U.S. 417, 431 n.19 (1998); *Guam Soc'y
24  of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1369 (9th Cir. 1992) (holding that
     because some of the seven plaintiffs had standing to challenge statute, it was not necessary to
25  determine the standing of the other plaintiffs); *Iyengar v. Barnhart*, 233 F. Supp. 2d 5, 11
     (D.D.C. 2002) ("It is well-settled that if a single plaintiff has standing to sue, the Court may
26  proceed to the merits without passing on the standing of the other individual plaintiffs").  In this
     case, there are individual members of Center for Biological Diversity and Friends of the Earth
27  with standing.

28
                                              17

The plaintiffs are three environmental groups whose self-declared goals are to "1) identify vulnerable species that will be most immediately affected by global warming; 2) educate, inform and mobilize the public with respect to global warming and its impact on the environment and on public health; 3) advocate before federal agencies whose policies and actions will impact greenhouse emissions and/or impact species and other resources vulnerable to climate change; 4) challenge projects which generate greenhouse gases; and 5) promote sustainable energy use."   Docket No. 8, at 15.   The enforcement of the GCRA and the issuance of the Research Plan are germane to the purposes of the plaintiff organizations.

### 3.    Participation of Individuals

There is no indication that resolving this case will require, or even be assisted by the participation of individual members of the Center for Biological Diversity, Greenpeace, Inc., or Friends of the Earth.   *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 861 (9th Cir. 2005); *Public Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1019 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 752 (2004).   Accordingly, the plaintiffs have organizational standing to maintain this action on behalf of their respective members.

STATUTORY STANDING UNDER THE APA AND THE MANDAMUS STATUTE

### 1.    Administrative Procedure Act

The doctrine of standing encompasses both constitutional and statutory considerations.   *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1353 (9th Cir. 1994).   In addition to the constitutional and organizational standing factors already analyzed, a petitioner who brings a statutory enforcement action under the Administrative Procedure Act (APA) must meet its statutory requirements for standing.   *See Citizens for Better Forestry*, 341 F.3d at 976; *Public Citizen*, 316 F.3d at 1019.

To have standing under the APA, the plaintiff must establish (1) that there has been final agency action adversely affecting the plaintiff, and (2) that, as a result, it suffers a legal wrong or that its injury

falls within the zone of interests of the statutory provision the plaintiff claims was violated.  *See Citizens for Better Forestry*, 341 F.3d at 976; *Public Citizen*, 316 F.3d at 1019.  For an action to be "final" under the APA, it should (1) mark the conclusion of the agency's decision-making process; and (2) be an action by which rights or obligations have been determined or from which legal consequences flow. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  An exception to this "final agency action rule" is the complete failure of an agency to act at all.  *See Independence Mining Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997); *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987); *Center for Biological Diversity v. Abraham*, 218 F. Supp. 2d 1143, 1157 (N.D. Cal. 2002).  Indeed, "agency action" is specifically defined by the APA to include the "failure to act."  5 U.S.C. § 551(13); *see also Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998); *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994).

### 2.    The Mandamus Statute

In addition to the APA, the plaintiffs' complaint also alleges the Court has jurisdiction under the mandamus statute.  Under 28 U.S.C. § 1361, the Mandamus and Venue Act of 1962, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Mandamus is available only when (1) the plaintiff's claim is clear and certain; (2) the defendant official's duty is ministerial and so plainly prescribed as to be free from doubt; and (3) no other adequate remedy is available.  *Johnson v. Reilly*, 349 F.3d 1149, 1154 (9th Cir. 2003); *Lowry v. Barnhart*, 329 F.3d 1019, 1021 (9th Cir. 2003).  Even if this test is met, a district court has discretion to deny relief. *Johnson*, 349 F.3d at 1154.  While mandamus may not be used to impinge upon an official's legitimate use of discretion, even in an area generally left to agency discretion, there may well exist statutory or regulatory standards delimiting the scope or manner in which such discretion can be exercised and in these situations, mandamus will lie when the standards have been ignored or violated.  *See Barron v. Reich*, 13 F.3d 1370, 1376 (9th Cir. 1994).

Moreover, whether jurisdiction is specifically predicated on the mandamus statute (28 U.S.C. § 1361), on the APA (5 U.S.C. § 706), or both, makes little practical difference, as the result and analysis are the same.  Where the relief the plaintiff is seeking is identical under either the APA or the mandamus statute, proceeding under one as opposed to the other is insignificant.  *See Independence Mining*, 105 F.3d at 507.  "Although the exact interplay between these two statutory schemes has not been thoroughly examined by the courts, the Supreme Court has construed a claim seeking mandamus under the MVA [Mandamus and Venue Act], 'in essence,' as one for relief under § 706 of the APA."  *Id.* (citing *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986)).

**3.      Statutory Standing**

The defendants maintain that the "failure to act" exception to the APA's "agency action" requirement is inapposite, because even if they were to take the contested actions and issue the reports, that action itself would not be judicially reviewable.  The defendants once again rely on *Guerrero* and *Hodel*, arguing that the Research Plan is merely a report to Congress and such Congressional reporting does not constitute an "agency action" as defined by section 551(13) of the APA.

Neither *Hodel* nor *Guerrero* offer relief for the defendants.  What was challenged in those cases was the adequacy or sufficiency of required reports; what is being challenged here is the *complete* failure to produce the Research Plan at all.  In *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 316 (D.C. Cir. 1988), the state of California challenged the Secretary of the Interior's off-shore leasing program under section 111 of Public Law 99-591, which authorized the Secretary to consider and accept any proposal regarding California leasing and directed the Secretary to "indicate in detail why any specific portion of the proposals . . . was not accepted" and to include this response along with his submission of a final program to Congress.  California argued that the Secretary failed to abide by the directive of section 111 because adequate explanations were not given for rejecting parts of the proposals.  *Id*.  In rejecting this challenge, the *Hodel* court stated:

> Here, the contention is not that the Secretary failed entirely to report back to Congress (and the Governor), but that the Secretarial response lacked the requisite "detail."

20

. . . .

> If the Secretary's response has indeed been deemed inadequate (in the statutory sense of "insufficiently detailed") by its recipient, then it is most logically for the recipient of the report to make that judgment and take what it deems to be the appropriate action. It scarcely bears more than passing mention that the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives.

*Hodel*, 865 F.2d at 318-19.

In *Guerrero v. Clinton*, 157 F.3d 1190, 1197 (9th Cir. 1998), the court held that "the *adequacy* of the . . . reports is not reviewable, and the injury asserted by the governments is correspondingly not redressable, because the . . . report that Congress asked for is primarily a tool for its own use, without cognizable legal consequences." (emphasis supplied).

Unlike *Hodel* and *Guerrero*, the challenge here springs from the defendants' complete failure to act and produce the Research Plan as required by the GCRA. Moreover, the GCRA dictates a discrete action that is required to be taken by statute: "The Chairman of the Council shall submit the [Research] Plan to the Congress within one year after November 16, 1990, and a revised Plan shall be submitted at least once every three years thereafter." 15 U.S.C. § 2934(a). The plaintiffs have alleged the failure of an agency action that is judicially reviewable under 5 U.S.C. § 706(1). *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) ("a claim under § 706(1) [of the APA] can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*") (emphasis in original). The plaintiffs in this action have done so.

The second part of the test for standing under the APA is that, as a result of the agency's action, or in this case, inaction, the plaintiffs have suffered a legal wrong or injury falling within the zone of interests of the statutory provision the plaintiffs claim was violated. *See Citizens for Better Forestry v. U.S. Dep't of Agriculture*, 341 F.3d 961, 976 (9th Cir. 2003); *Public Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1019 (9th Cir. 2003). As delineated more at length above, the plaintiffs have suffered both a "procedural" and "informational" injury due to the defendants' failure to produce the Research Plan and a procedural injury resulting from the failure to deliver the Scientific Assessment. Because the plaintiffs have standing to proceed under the APA, and the relief they are seeking is identical whether analyzed under the APA or the mandamus statute, the Court finds that it is not necessary to also

21

1   determine whether the plaintiffs have independent standing under that statute as well.  Accordingly, the

2   defendants' motion to dismiss for lack of standing is denied.

3

4   **B.**                          **MOTION FOR INTERVENTION**

5        Senator John Kerry and Congressional Representative Jay Inslee (intervenor-applicants) seek

6   to intervene in this action as plaintiffs.  They have filed a motion to intervene as of right under Federal

7   Rule of Civil Procedure 24(a), or, alternatively, for permissive intervention under Rule 24(b).  *See*

8   Docket No. 53.  The intervenor-applicants contend that their unique position as legislators shores up any

9   difficulties with the original plaintiffs' standing on the Scientific Assessment claim, stating that "they

10  are self-evidently in a different position to rebut this standing argument than are non-governmental

11  Plaintiffs."  Docket No. 54, at 9.  "Whether or not the GCRA explicitly mandates public access to the

12  [Scientific] Assessment, the statute unquestionably establishes congressional reporting requirements on

13  its face [and thus] prospective Intervenors' standing interests are categorically different from those of

14  Plaintiffs."  *Id*.

15

16  **1.       Intervention as of Right**

17       Federal Rule of Civil Procedure 24 allows two types of intervention by a non-party in ongoing

18  litigation: intervention as of right, and permissive intervention.  To intervene as of right, an applicant

19  must demonstrate that (1) the intervention is timely; (2) the applicant has a significantly protectable

20  interest relating to the property or transaction that is the subject of the action; (3) the disposition of the

21  action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4)

22  the existing parties may not adequately represent the applicant's interest.  *See Gonzalez v. Arizona*, 485

23  F.3d 1041, 1151 (9th Cir. 2007); *California ex rel. Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir.

24  2006); *United States v. Alisal Water Corp*., 370 F.3d 915, 919 (9th Cir. 2004).  The party seeking to

25  intervene bears the burden of showing that all of the requirements for intervention have been met.  *See*

26  *Alisal*, 370 F.3d at 919; *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003), *cert. denied*, 540

27

28                                                    22

U.S. 1017 (2003).  However, Rule 24 is construed liberally in favor of potential intervenors, and a district court accepts as true the non-conclusory allegations made in support of an intervention motion. *See Lockyer*, 450 F.3d at 440; *Arakaki*, 324 F.3d at 1083; *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818-19 (9th Cir. 2001).

### a.    Timeliness

The timeliness of the motion to intervene is not disputed and does not present a bar to intervention.

### b.    Significantly Protectable Interest

An applicant has a significantly protectable interest in an action if (1) the applicant asserts an interest that is protected under some law, and (2) there is a relationship between its legally protected interest and the plaintiff's claims.  *See Lockyer*, 450 F.3d at 441; *Alisal*, 370 F.3d at 919; *Donnelly v. Glickman*, 159 F.3d 405, 409-10 (9th Cir. 1998).

Neither the Senate nor the House of Representatives as a whole is seeking to compel the submission of the Research Plan or the Scientific Assessment.  Nor are the intervenor-applicants alleging they have been authorized to represent their respective Houses of Congress in this action.  *See Raines v. Byrd*, 521 U.S. 811, 829 (1997) ("attach[ing] some importance that appellees have not been authorized to represent their respective Houses of Congress in this action . . . .").  Rather, the intervenor-applicants claim a right to the Research Plan and Scientific Assessment in their capacity as individual members of Congress.

According to the applicants, "As a member of Congress, Sen. Kerry is entitled to receive the [Scientific] Assessment and the latest Research Plan under the GCRA."  Docket No. 55 (Intervenor Compl. at ¶ 18).  Likewise, "As a member of Congress, Rep. Inslee is entitled to receive the [Scientific] Assessment and the latest Research Plan under the GCRA.  *Id.* at ¶ 19.  The intervenor-applicants declare:

> Plaintiff-Intervenors are harmed by the failure of Defendants to produce the overdue [Scientific] Assessment and Research Plan.  These documents are intended to, and if produced will, assist Plaintiff-Intervenors in the development, drafting, and review of appropriate legislation to respond to the crisis of climate change.  The distribution of

1

2

3

4

> these documents within the government will allow the combined efforts of Congress and administrative agencies to be efficiently and effectively channeled toward fully informed and meaningful solutions to the climate crisis.  Defendants' failure to produce the documents impairs and impedes Plaintiff-Intervenors ability to engage in these *policymaking and legislation activities*.  Additionally, Plaintiff-Intervenors have an *interest in keeping their constituents and the national and global public well informed of these critical issues*.

5   *Id*. at ¶ 20 (emphasis supplied).

6        Taking the allegations of the intervenor-applicants' complaint as true, they have an interest in

7   this action.  What is significant in their complaint is that they claim both an interest as members of

8   Congress to protect their "ability to engage in . . . policymaking and legislation activities" and as

9   representatives of their constituents, whom they seek to keep "well informed of these critical issues."

10       The more difficult question is whether the interests advanced by the intervenor-applicants are

11  legally protectable.  Congress as a whole is entitled to the Research Plan and the Scientific Assessment.

12  *See* 15 U.S.C. § 2934(a) ("The Chairman of the Council shall submit the [Research] Plan to the

13  Congress . . . ."); *Id*. § 2936 ("the Council, through the Committee, shall prepare and submit to the

14  President and the Congress [a Scientific] assessment . . . .").  It does not necessarily follow, though, that

15  individual members of Congress have a legally protectable interest in either report, as a number of

16  "legislator standing" cases demonstrate.

17       For example, in *Raines v. Byrd*, 521 U.S. 811, 814-16 (1997), a number of members of the

18  Senate and House of Representatives sued pursuant to a provision of the Line Item Veto Act which

19  declared that any member of Congress could challenge the Act.  The Supreme Court declared that they

20  had "alleged no injury to themselves as individuals . . ., the institutional injury they allege is wholly

21  abstract and widely dispersed . . ., and their attempt to litigate this dispute at this time and in this form

22  is contrary to historical experience." *Id*. at 829.  The *Raines* Court contrasted its conclusion with *Powell*

23  *v. McCormack*, 395 U.S. 486, 496 (1969), where it held that a member of Congress's constitutional

24  challenge to his individual exclusion from the House of Representatives presented an Article III case

25  or controversy.  The Court noted that *Powell* presented a personal injury as distinct from an institutional

26  injury to the whole of one of the legislative bodies.  *See Raines*, 521 U.S. at 821.

27

28

24

From *Raines*, the Ninth Circuit has drawn the lesson that "at least as to individual legislators, there is no standing unless their own institutional position, as opposed to their position as a member of the body politic, is affected." *Newdow v. United States Congress*, 313 F.3d 495, 499 (9th Cir. 2002). The *Newdow* court also noted that "every time a statute is not followed . . . the votes of legislators are mooted and the power of the legislature is circumscribed in a sense, but that is no more than a facet of the generalized harm that occurs to the government as a whole." *Id.* at 500.

And in a case that is particularly informative, *Kucinich v. Defense Finance and Accounting Service*, 183 F. Supp. 2d 1005, 1006 (N.D. Ohio 2002), United States Representative Dennis J. Kucinich challenged the awarding of a military contract as violating federal law and the Constitution, and sued in his representational capacity as "trustee" of his constituents. In distinguishing *Raines v. Byrd*, Kucinich argued that Supreme Court precedent strictly limiting the standing of members of Congress to sue left open the possibility of "institutional standing" to sue "within their representational capacity." *Id.* at 1008. The court, however, rejected carving out an exception to *Raines* for legislators suing in their representational capacity. *Id.* at 1010. The court found that Kucinich bringing suit "as the representative of all his constituents," was clearly seeking to vindicate an institutional injury to Congress, and therefore lacked standing based on *Raines*. *Id.* at 1009.

Contrasting these cases is *United States House of Representatives v. United States Department of Commerce*, 11 F. Supp. 2d 76, 85 (D.D.C. 1998), *appeal dismissed*, *Department of Commerce v. United States House of Representatives*, 525 U.S. 316 (1999), where the court found that the House of Representatives *as a whole* had Article III standing where it suffered an "informational injury" because Census Bureau sampling techniques deprived it of true population figures.

While the foregoing cases deal specifically with standing, that concept, and in particular the element of "injury in fact," shares a kinship to the notion of a protectable legal interest. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (defining an "injury in fact" as "an invasion of a legally protected interest"). These cases therefore offer some guidance in assessing whether the intervenor-applicants as individual members of Congress have a legally protectable interest in the

1    Research Plan or the Scientific Assessment.  The Court finds that they do not.

2           The arguments raised by the intervenor-applicants place them on the horns of a dilemma from

3    which they do not successfully extricate themselves: they are either suing as individual members of

4    Congress seeking redress for an institutional injury to Congress as a whole, an option foreclosed by

5    *Raines* and *Newdow*, or they are suing on behalf of their constituents, an alternative persuasively

6    blocked by the example set in *Kucinich v. Defense Finance and Accounting Service*, 183 F. Supp. 2d

7    1005 (N.D. Ohio 2002).   The complaint suggests both.   Irrespective of their posture, though, the

8    intervenor-applicants have not demonstrated a legally protectable interest in the production of the

9    GCRA reports as individual members of Congress.  As in *Kucinich*, the Court finds that an individual

10   legislator's characterization of his or her interest---as a member of Congress or as a representative of

11   his or her constituents---does not obviate the holding of *Raines*.

12           **c.       Whether Disposition will Impair or Impede the Intervenors' Interests**

13           Even if an action affects the proposed intervenors' interests, their interests may not be impaired

14   if they have "other means" to protect themselves.  *See Lockyer*, 450 F.3d at 441; *Alisal*, 370 F.3d at 921.

15   Senator Kerry and Congressman Inslee have other means to protect their stated interests.

16           In *Raines v. Byrd*, 521 U.S. 811, 829 (1997), the Supreme Court noted that its conclusion that

17   the legislators lacked standing did not deprive members of Congress of an adequate remedy to address

18   alleged institutional injuries.  The Court identified various political mechanisms legislators have at their

19   disposal.  *Id*.  Likewise, in *Riegle v. Federal Open Market Committee*, 656 F.2d 873, 881 (D.C. Cir.

20   1981), the court expressed its judgment that "Where a congressional plaintiff could obtain substantial

21   relief from his fellow legislators through the enactment, repeal, or amendment of a statute, [the] court

22   should exercise its equitable discretion to dismiss the legislator's action."  These cases recognize that

23   judicial recourse is not the only option available for members of Congress to protect their interests.  *See,*

24   *e.g., Kucinich v. Bush*, 236 F. Supp. 2d 1, 9 (D.D.C. 2002) ("The fact that plaintiffs have several

25   political arrows in their legislative quiver underscores the reluctance of courts needlessly to involve

26   themselves in inter-branch disputes").   American historical practice suggests that legislators *qua*

27

28                                                      26

1    legislators should protect their interests through legislating rather than litigating.  *Cf. Raines*, 521 U.S.

2    at 826-29.

3    Senator John Kerry is a member of the Senate Committee on Commerce, Science, and

4    Transportation.  *See* Docket No. 55 (Intervenor Compl. at ¶ 18).  Representative Jay Inslee is a member

5    of the House Committee on Energy and Commerce and its Subcommittee on Energy and Air Quality.

6    *See id.* at ¶ 19.  In fact, the intervenor-applicants declare themselves "congressional leaders in the global

7    change arena . . . ."  Docket No. 53, at 5.

8    The intervenor-applicants, as Congressional leaders in the global change arena, are in a unique

9    position to persuade their colleagues to convene oversight hearings on why the terms of the GRCA are

10   not being followed by Executive Branch actors; to issue subpoenas compelling the defendants to testify

11   to their non-compliance with the Act; and/or use the power of appropriation as leverage upon the

12   Executive Branch to comply with the GCRA.  *See, e.g., Watkins v. United States*, 354 U.S. 178, 187

13   (1957) ("The power of the Congress to conduct investigations is inherent in the legislative process.  That

14   power is broad."); *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927) (affirming the Senate's right to

15   enforce its power of inquiry by subpoenaing witnesses for information relevant to its legislative

16   concerns).  The intervenor-applicants might also lead a call to Congress to amend the GCRA in several

17   ways to allow for greater judicial review for interested citizens or organizations.  The GCRA could be

18   amended to provide for citizen-suits, a provision found in many environmental statutes.  The GCRA

19   could also be modified to explicitly state that the general public is entitled to the information of both

20   the final draft of the Research Plan and the Scientific Assessment.  This would afford members of the

21   public stronger basis for standing to pursue claims of recalcitrant compliance with the GCRA and

22   enforce public dissemination of the final versions of these documents.  These various "political arrows"

23   may be drawn and released by the intervenor-applicants at any time to protect their interests.

24        **d.      Adequate Representation by Existing Parties**

25   Because the intervenor-applicants have not demonstrated a right to intervene under the prior two

26   prongs, analysis under the final part of the test is unnecessary.  The motion to intervene as of right is

27

28                                          27

1    denied.

2

3

4    **2.      Permissive Intervention**

5           Turning then to permissive intervention under Federal Rule of Civil Procedure 24(b)(2), there

6    are three necessary prerequisites: (1) the applicant must show independent grounds for jurisdiction; (2)

7    the motion must be timely; and (3) the applicant's claim or defense, and the main action, must have a

8    question of law or a question of fact in common. *See San Jose Mercury News, Inc. v. U.S. Dist. Court---*

9    *Northern Dist.*, 187 F.3d 1096, 1100 (9th Cir. 1999); *League of United Latin Am. Citizens v. Wilson*,

10   131 F.3d 1297, 1308 (9th Cir. 1997).  A district court's discretion to grant or deny permissive

11   intervention is broad, and includes the discretion to limit intervention to particular issues or for limited

12   purposes. *See San Jose Mercury News*, 187 F.3d at 1100; *Van Hoomissen v. Xerox Corp.*, 497 F.2d 180,

13   181 (9th Cir. 1974).

14          **a.      Independent Grounds for Jurisdiction**

15          The intervenor-applicants' alternative request for permissive intervention must be denied for

16   failing to demonstrate independent grounds for jurisdiction.  The holdings of *Raines v. Byrd*, 521 U.S.

17   811 (1997), and *Newdow v. United States Congress*, 313 F.3d 495 (9th Cir. 2002), directly foreclose the

18   intervenor-applicants' assertion of standing as individual members of Congress.  Without standing to

19   pursue their claims, jurisdiction for the Court to entertain the intervenor-applicants' complaint is

20   lacking.  Like the motion for intervention as of right, the alternative motion for permissive intervention

21   must be denied.[6]

22

23

24

25

---

26   [6]    While the Court denies the intervenor-applicants' motion to intervene, the Court has read and
         considered the intervenor-applicants' amicus brief and will consider again granting leave should
27       the intevenor-applicants wish to file further briefing with the Court.

28                                                    28

1

2

3    **C.**                    **THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

4          The plaintiffs seek judgment as a matter of law that the defendants are in violation of the GCRA.

5

6    **1.    Summary Judgment Standards**

7          Summary judgment is appropriate if no genuine issue of material fact exists and the moving

8    party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477

9    U.S. 317, 322-23 (1986).  The party moving for summary judgment must demonstrate that there are no

10   genuine issues of material fact.  *See Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir.

11   2007).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the

12   non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Rivera v. Philip*

13   *Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  An issue is "material" if its resolution could affect

14   the outcome of the action.  *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d at 1146.

15         In responding to a properly supported summary judgment motion, the non-movant cannot merely

16   rely on the pleadings, but must present specific and supported material facts, of significant probative

17   value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

18   U.S. 574, 586 n.11 (1986); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002); *Federal*

19   *Trade Comm'n v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001).  In determining whether a genuine issue of

20   material fact exists, the court views the evidence and draws inferences in the light most favorable to the

21   non-moving party.  *See Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827,

22   832 (9th Cir. 2004); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004).

23

24   **2.    Analysis**

25         In this case there are no disputed facts, making this action particularly well-suited for summary

26   adjudication.  The GCRA mandates that "a revised Plan shall be submitted at least once every three

27

28
                                                   29

years . . . ." 15 U.S.C. § 2934(a).  The last Research Plan issued was in July 2003, and the defendants make no claim that a revised plan was submitted by July 2006, or since that time.  The defendants have therefore unlawfully withheld action they are required to take---producing an updated National Global Research Plan at least every three years.  *Cf. Forest Guardians v. Babbitt*, 174 F.3d 1178, 1191 (10th Cir. 1999) (holding that "[w]hen an agency fails to meet a concrete statutory deadline, it has unlawfully withheld agency action" under the APA).

In addition, the defendants are in violation of 15 U.S.C. § 2936, which dictates that "On a periodic basis (not less frequently than every 4 years), the Council, through the Committee, shall prepare and submit to the President and the Congress [a Scientific] assessment."  It has been almost seven years since the last Scientific Assessment was published on October 31, 2000 and submitted to Congress in November 2000, triggering a due date for a subsequent Scientific Assessment in November 2004.  Again, the defendants do not dispute this.  The defendants have not adhered to the text of the statute or its mandates.

The defendants' only substantive response is that the Court "should defer to the CCSP's decisions related to the manner of compliance [with the GCRA]."  Docket No. 49, at 29.  They posit that "[i]n Defendants' appropriate exercise of its judgment, it has determined only recently that the initiation of a process to revise the Research Plan has become necessary and advisable."  *Id.* at 30.  In fact, the defendants go so far as to assert, somewhat incredulously, that "the GCRA grants Defendants substantial discretion in the manner in which they may produce and submit periodic Scientific Assessments and Research Plans."  *Id.* at 33.  The premise of this argument is that the defendants have discretion in determining the manner in which to comply with the GCRA reporting requirements, which the defendants define as including the time for compliance.  *See id.* at 24, 29-30.  The defendants are wrong.  Congress has conferred no discretion upon the defendants as to when they will issue revised Research Plans and Scientific Assessments.  With respect to timing, Congress has unambiguously declared that the reports are to be issued at intervals no less often than three or four years respectively.

While not explicitly stated, the defendants appear to be vaguely invoking deference under

30

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), posturing the CCSP as an agency with discretion to reasonably interpret the GCRA.  Under *Chevron*, a court defers to an agency's reasonable interpretation of a statute, if a statute is ambiguous, and if, after examining the statute using the "traditional tools of statutory construction," that ambiguity remains.  *Chevron*, 467 U.S. at 842; *see also General Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004) (*Chevron* deference applies only if other "devices of judicial construction have been tried and found to yield no clear sense of congressional intent").  Here the most ordinary of all tools of statutory construction, reading the statute, reveals that Congress has imposed clear-cut, unambiguous deadlines for compliance.  There is no ambiguity, and therefore no basis for deferring to the defendants' suggestion otherwise.

Accordingly, the plaintiffs' motion for summary judgment is granted.  Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court finds the defendants are in violation of sections 2934 and 2936 of the Global Change Research Act, and that declaratory judgment in the plaintiffs' favor is warranted.

### INJUNCTION/REMEDY

**1.     Equitable Relief**

In addition to a declaratory judgment, the plaintiffs' requested relief includes an injunction compelling the defendants to produce the Research Plan and the Scientific Assessment by a date certain.  They have suggested nine months from the date of the Court's order.

Unless restricted by statute, once a district court's equitable powers are properly invoked, it has "broad discretionary power" in fashioning injunctive relief.  *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 495-96 (2001); *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973); *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (equitable power is displaced only by a "clear and valid legislative command"); *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641 (9th Cir. 2004) (citation omitted) (a district court has "broad latitude in fashioning equitable relief when necessary to remedy an established wrong").  For instance, courts may use that power to enforce prompt compliance

with a court order by an administrative agency.  *See High Sierra Hikers*, 390 F.3d at 642 n.6 (upholding injunction requiring Forest Service to complete NEPA process no later than December 31, 2005); *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 823, 834-35 (9th Cir. 2002) (affirming district court's injunction requiring agency to undertake an environmental review of sixty-eight permits on an expedited schedule); *Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1380, 1384 (9th Cir. 1986) (upholding a district court order requiring the Department of Interior to submit draft legislative environmental impact statements to public for comment where the Department failed to comply with its statutory obligation to do so).

**2.      Analysis**

The Court has found the plaintiffs have suffered cognizable procedural and informational injuries due to the defendants' failure to produce "a summary of the proposed [Research] Plan [that] shall be published in the Federal Register for a public comment period . . . ."  15 U.S.C. § 2934(f).  A decree that the defendants publish a summary of the Research Plan in the Federal Register is therefore appropriate redress for these injuries.  The more difficult questions are whether the procedural and informational injuries stemming from the failure to produce the summary of the Research Plan are bases for compelling the issuance of a revised Research Plan and updated Scientific Assessment, as sought by the plaintiffs, in addition to the summary itself.  The Court requested additional briefing from the parties on this point and they have proffered their arguments.

The defendants reiterate their position that the public comment provision applies only when and if they submit a revised Research Plan to Congress, and that absent actually submitting a revised Research Plan without allowing for public comment, the plaintiffs have suffered no procedural or information injury.  The Court previously found this argument unpersuasive in its analysis of the asserted procedural injury, and finds it equally so here.  The logic of the defendants' position suggests that if they never take any action on the Research Plan, the public comment provision is never triggered.  The defendants, however, are not at liberty to circumvent a Congressional mandate through indefinite

delay of the Research Plan.  Otherwise, there would be no reason for Congress to include this provision

in the GCRA.  Again, the Act imposes an affirmative duty on the defendants to produce the Research

Plan on a periodic basis, so public participation is not a contingency that may be indefinitely postponed.

The Act simply does not give the defendants the discretion of when or if they will submit the Research

Plan to Congress other than at minimum intervals.  The premise of this argument therefore does not

stand.  For their part, the plaintiffs contend that

> publication of the summary [of the Research Plan] alone does not fully redress Plaintiffs'
> injuries, remedy Defendants' violations of law, or effectuate the intent of Congress.  If
> Defendants were compelled to initiate the public review process pursuant to Section
> 2934(d), yet were free to disregard the related statutory deadlines for the submission of
> the revised Plan to Congress following such review, Plaintiffs' participation would be
> rendered meaningless and Defendants' violations of law would continue unabated.

Docket No. 70, at 1.

They add that the "Defendants' failure to produce a revised Plan directly thwarts Plaintiffs'

participation in the process envisioned by Congress," and that "[a]bsent Defendants' compliance with

the timeline for completion of a revised Plan, Plaintiffs' participation is rendered meaningless and its

procedural injury left partially unredressed."  *Id*. at 3-4.  The Court agrees.  An injunction limited to

mandating the summary of the Research Plan would not rectify the procedural and informational injuries

incurred by the plaintiffs.  Without issuance of the revised Research Plan, the public participation in that

Research Plan has no real value or substance.  The consultation with "academic, State, industry, and

environmental groups and representatives" would be a mere hortatory provision within the Act.  15

U.S.C. § 2934(f).  Thus, not requiring the defendants to produce a final revised Research Plan would

not fully implement the public participation contemplated by the GCRA.  A court must presume that

absent clear Congressional intent to the contrary, the legislature did not intend to pass vain or

meaningless legislation.  *See International Ass'n of Machinists & Aerospace Workers v. BF Goodrich*

*Aerospace Aerostructures Group*, 387 F.3d 1046, 1057 (9th Cir. 2004); *see also Biodiversity Legal*

*Found. v. Badgley*, 309 F.3d 1166, 1175 (9th Cir. 2002) (it is an elementary canon of construction that

an interpretation which gives effect to all sections of a statute is preferred).  Congress has mandated that

a "summary of the proposed Plan shall be published in the Federal Register for a public comment period

33

of not less than 60 days." 15 U.S.C. § 2934(f).  The Court must presume Congress included this public comment period for a purpose, in this case, for the purpose of developing a comprehensive record of information to be considered, analyzed, incorporated and/or addressed in a meaningful manner in the preparation of the ultimate draft of the Research Plan.

By extension, the same reasoning applies to the Scientific Assessment.  The GCRA directs the defendants to submit a Scientific Assessment which "integrates, evaluates, and interprets the findings of the [United States Global Change Research] Program," which are based, in part, on the public input required for the Research Plan.  *Id*.  The plaintiffs quite accurately point out that the Scientific Assessment "represents the end product and primary purpose of Plaintiffs' participation in the development of climate change research under the Act."  Docket No. 70, at 9.  The Court is therefore inclined to conclude that equitable relief should include not only the summary of the Research Plan, but also the final revised Research Plan and the updated Scientific Assessment in order to fully implement and give effect to all provisions of the Act.

Such an injunction is warranted whether an exercise of the Court's discretion under its traditional equitable powers, as a mandatory injunction required to effectuate a Congressional purpose, or in order to compel unlawfully withheld agency action under the APA.

The traditional requirements for the issuance of a "discretionary" permanent injunction are (1) the likelihood of substantial and immediate irreparable injury; and (2) the inadequacy of remedies at law.  *See Dream Palace v. County of Maricopa*, 384 F.3d 990, 1010 (9th Cir. 2004).  In issuing an injunction, the Court must balance the equities between the parties and give due regard to the public interest.  *High Sierra Hikers*, 390 F.3d at 642.  Courts of equity cannot, however, in their discretion, reject the balance that Congress has struck in a statute.  *See Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 497.  Their choice (unless there is statutory language to the contrary) is simply whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all.  *Id*. at 497-98.

In this case, the plaintiffs have shown not only a likelihood of irreparable damage, they have

34

demonstrated actual success on the merits that they are incurring an ongoing injury to procedural and informational rights granted them by statute. *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990); *LaDuke v. Nelson*, 762 F.2d 1318, 1330 (9th Cir. 1985), *modified on other grounds*, 796 F.2d 309 (9th Cir. 1986). Absent an injunction, these injuries will not be rectified. Further, given that the procedural and informational injuries sustained by the plaintiffs defy calculation, there are no monetary damages or other legal remedies that would adequately compensate the plaintiffs. *See Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir. 1991). Finally, Congress has determined the public interest and the respective rights of the parties by mandating the duties of the defendants and the rights of the public under the GCRA. Consequently, there is little balancing of the equities for the Court to undertake. *Cf. United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987) ("Once Congress . . . had decided the order of priorities in a given area, it is for the court to enforce them when asked"). The plaintiffs have demonstrated their right to an injunction.[7]

In addition to the traditional analysis for injunctive relief, the Court finds that an injunction is necessary to effectuate the Congressional purpose of the GCRA. *See Biodiversity Legal Found.*, 309 F.3d at 1177 (citing *TVA v. Hill*, 437 U.S. 153, 194 (1978)) ("when federal statutes are violated, the test for determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional purpose behind the statute"); *see also National Wildlife Fed'n v. National Marine Fisheries Serv.*, 422 F.3d 782, 795-96 (9th Cir. 2005) (per curiam). As mentioned before, the purpose of the GCRA, as enunciated by Congress, "is to provide for development and coordination of a

---

[7]     An evidentiary hearing is normally required before the issuance of a permanent injunction, unless the facts are not in dispute. *See Charlton v. Estate of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988) (citing *Fengler v. Numismatic Americana, Inc.*, 832 F.2d 745, 747 (2d Cir. 1987); *Professional Plan Examiners of New Jersey, Inc. v. Lefante*, 750 F.2d 282, 288 (3d Cir. 1984); *United States v. McGee*, 714 F.2d 607, 613 (6th Cir. 1983)); *see also Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville & Davidson County*, 466 F.3d 391, 398 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 2088 (2007) ("Unless disputed questions of material fact exist, no trial or evidentiary hearing is necessary for the district court to enter a permanent injunction"); *Socialist Workers Party v. Illinois State Bd. of Elections*, 566 F.2d 586, 587 (7th Cir. 1977) (per curiam), *aff'd on other grounds*, 440 U.S. 173 (1979); *Standard Oil Co. of Texas v. Lopeno Gas Co.*, 240 F.2d 504, 509-10 (5th Cir. 1957). There are no facts in dispute. A hearing in this case is not required.

comprehensive and integrated United States research program which will assist the Nation and the world to understand, assess, predict, and respond to human-induced and natural processes of global change." 15 U.S.C. § 2931(b).  Fulfilling this purpose begins with the issuance of a revised Research Plan and Scientific Assessment.

Moreover, given the Court's finding that the defendants have unlawfully withheld action required by the GCRA, injunctive relief is directed by the APA.  Under the APA, a court "shall" "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  The defendants have unlawfully withheld reports they are required to disseminate.  The plaintiffs have properly asserted a claim for relief through the auspices of the APA.  Their claim is meritorious.  The Court, accordingly, shall compel action to bring the defendants into compliance with the law.

For the foregoing reasons, the Court ORDERS the defendants to comply with the GCRA and to issue a revised Research Plan and Scientific Assessment.

**3.     Time for Compliance**

The defendants offer no definitive statement of when they intend to complete the revised Research Plan that was due in July 2006.  Somewhat vaguely, they offer the assertion that they have "initiated the process for producing a revised Research Plan."  Docket No. 49, at 2.  Defendant Dr. William Brennan states, under a heading of "Development of Research Plan," that in "2002 the CCSP [Climate Change Science Program] began the process of developing its 10-year Strategic Plan with the goal of providing the best possible response to the requirements of the GCRA."  Docket 49, Ex. 3 (Brennan Decl. at ¶ 9).  The following paragraph of the declaration suggests that Brennan is using the designation "Strategic Plan" as an interchangeable reference to the "Research Plan" of the Act.  *Id.* at ¶ 10.  If this is correct, the defendants plan to release a revised Research Plan sometime in 2012.  This is far afield the mark set by Congress.  As Brennan also states in his declaration, "The CCSP was created to integrate and coordinate the climate resources and research of the Federal Government to obtain the best possible science concerning climate variability and change *and to respond to the*

36

*requirements of the GCRA*." *Id.* at ¶ 5 (emphasis added).  The reporting requirements of the GCRA are simple and direct: "The Chairman of the Council shall submit the [Research] Plan to the Congress within one year after November 16, 1990, and a revised Plan shall be submitted at least once every three years thereafter."  15 U.S.C. § 2934(a).

As the Research Plan is now more than a year overdue, the Court ORDERS that a summary of the revised proposed Research Plan be published in the Federal Register no later than March 1, 2008, and that the proposed Research Plan itself be submitted to Congress not later than 90 days thereafter. This date allows the defendants six months to prepare the summary of the Plan, and then 90 days for public comment and revision provided for by the GCRA.  *See* 15 U.S.C. § 2934(f).

With respect to the Scientific Assessment, the defendants maintain that they "are in the process of issuing 21 Assessment and Synthesis reports that will fulfill the requirements [to produce a Scientific Assessment]."  Docket No. 49, at 2.  The defendants have represented to the Court that they plan "to complete those reports necessary to comply with [the Scientific Assessment section of the CGRA] by the end of 2007 . . . ."  Docket No. 49, at 4.  Given that the Scientific Assessment must in some manner integrate, evaluate, and interpret the public comments of the Research Plan, and given the defendants' representation that they are able to oblige the required provisions of the Scientific Assessment by the end of this year, the Court ORDERS the Scientific Assessment be produced no later than May 31, 2008. The defendants should have little difficulty accommodating this deadline, having declared that "This proposed time-frame [nine months after the Court's order] already comports with Defendants' scheduled completion of the required synthesis and assessment reports."  Docket No. 49, at 32 n.15.[8]

---

[8]   The plaintiffs have expressed concern with the defendants' stated plan to issue twenty-one separate reports rather than a single Scientific Assessment.   The Court appreciates this concern and to the extent the defendants suggest these twenty-one reports will be disseminated over the course of several years, the Court agrees this contravenes the time frame imposed by Congress. The plaintiffs have not, however, specifically requested the Court to order the production of a single Scientific Assessment, so the Court does not reach this issue.  Moreover, while the Act specifies the time for submitting the Assessment, as well as particular elements to be analyzed and evaluated, Congress has not likewise clearly dictated the form the Assessment must take. Thus, while the report(s) must be submitted within the period directed by statute, the precise organization of the report(s) is left open by the Act.

37

1
2
3                                  **CONCLUSION**

4          Accordingly, the defendants' motion to dismiss for lack of jurisdiction/alternative motion for

5  summary judgment [Docket No. 48] is DENIED.  The motion to intervene [Docket No. 53] is likewise

6  DENIED.  The plaintiffs' motion for summary judgment [Docket No. 7] is GRANTED.

7          It is further ORDERED that the Court will retain jurisdiction over this action to ensure

8  compliance with the Court's decree.[9]

9          IT IS SO ORDERED.

10
11      August 21, 2007                        _Saundra B Armstrong_____

12                                             Saundra Brown Armstrong
                                               United States District Judge
13
14
15
16
17
18
19
20
21
22
23
24  _____

25  [9]    If the plaintiffs wish the Court to entertain a request for fees under the Equal Access to Justice
        Act consistent with their complaint, they are instructed to file an appropriate motion within thirty
26      days of the entry of final judgment.  The Court anticipates that should such a motion be
        submitted, of particular importance will be whether the government's position in this action was
27      "substantially justified" as that term is used in the EAJA.  28 U.S.C. § 2412(d)(1)(A).  The
        briefing should adequately address this issue.
28
                                               38